Stanley Gartenstein J.
Proceedings before the court involve efforts by the Little Flower Children’s Services, an authorized voluntary child care agency under the applicable provisions of the Social Services Law, to terminate parental rights to the subject infants, Michelle, born May 23, 1967, now nine years old, and Patricia, born August 19, 1969, now seven. The biological parents are the respondents. Five separate proceedings and cross proceedings have been before the court at some stage of this bitter litigation, viz.: one proceeding for each subject child against both natural parents framed in abandonment (Social Services Law, § 384); one proceeding for each subject child against the natural father only, framed in permanent neglect pursuant to section 611 of the Family Court Act and habeas corpus proceedings brought on behalf of the biological father for custody of both girls. The custody proceedings have heretofore been dismissed for failure to prosecute. The abandonment proceedings have been held in abeyance pending resolution of the permanent neglect proceedings against the biological father which were tried before the undersigned. Upon conclusion of the trial involving alleged permanent neglect by the natural father, decision was reserved and the abandonment proceeding was severed as to him and marked ready for trial for a date certain as to the mother. This decision and order is issued in the permanent neglect proceeding.
the facts:
Michael W. and Mae W., the biological parents of the subject infants, were married on July 23, 1965. The issue of this marriage consists of a boy, Wayne Michael, born November 1, 1965, and the two girls. Wayne Michael, who is not involved in or affected by these proceedings, is now 11 and resides with his paternal grandmother in an up-State community.
Michelle and Patricia, then two years and five months old respectively, were first placed on February 9, 1970 by the maternal grandmother after they and Wayne Michael were left with her by the biological mother. No formal surrender instrument was ever executed by either of the natural parents or the maternal grandmother. The natural father testified *370 without contradiction that upon learning from a friend that all his children, including Wayne Michael, were at the neighborhood social services center and a placement agáinst his will imminent, he rushed to the center, took Wayne Michael bodily from there, and upon his return to "rescue” his other children, found them gone with no information about their whereabouts available. Upon being informed of their placement at the agency and of visitation procedures at a later date, he did in fact see the girls at agency facilities on a sometime regular and sometime sporadic basis until his last date of visitation, May 16, 1971. It is undisputed, though subject to contradictory explanations, that as late as August 9, 1972, the natural father was at the agency with his then paramour to visit her children in placement and that he did not see his own.
Both children were reunited with the natural mother on December 6, 1972. They were voluntarily returned to agency care by her on April 9, 1973 when she found herself incapable of caring for them and she has not visited them since that date. In the interim, the father was not heard from by the agency until a "diligent search” (legal condition precedent for freeing the children for adoption) located him and he met with the social worker on January 20, 1974 to discuss possible resumption of his role as father or freeing the children for adoption by the excellent foster parents with whom the girls had been living since their return to placement in 1973. Another meeting took place on February 12, 1974 at which time he was advised that in view of his continued absence and the desire of the foster parents to adopt the girls, visitation would be denied in the future and litigation commenced to free the girls for adoption. Proceedings were in fact filed toward this end on April 28, 1975.
In the interim, the marital status of the parties had been dissolved by a decree of the Supreme Court, County of Nassau, entered on October 25, 1972 in favor of the father against the mother on an oral counterclaim framed in abandonment and adultery, with the issue of custody of all the children referred to the Family Court to hear and determine. Neither party instituted proceedings in this court for custody pursuant to this referral.
Before considering the application of applicable statute and case law, it is here germane to note that in the course of proceedings, the court, on consent of all parties on record, met *371 with and interviewed separately the foster parents; the girls; Wayne Michael, brought from his up-State home; the agency workers; the natural father; and the natural mother. Considering how unsettled their status has been and the length and intricacy of these proceedings, the girls are intelligent, alert, beautifully cared for, happy and secure in the home of their foster parents. They are emphatic about their desire to remain there. The girls are aware of the possible import and/or effect of these proceedings, of their own status and of their natural family. In point of fact, to settle all doubts in their minds and in the contesting natural father’s, one visit was in fact arranged for him during the course of this litigation on consent of all parties and the child care worker, which was approved by the court. This visit went well but changed neither the girls’ desire to remain where they are nor the father’s resolve in contesting these proceedings. Additionally, Wayne Michael was interviewed by the court. In contrast to his sisters’ resolve not to see their father or their brother, he looks forward either to full reunion with them or at least to a meaningful relationship. In point of fact, a shattering scene took place outside the court’s chambers where Wayne Michael who had anticipated a reunion with his sisters, was accidentally brought into contact with them and ignored.
This information assumes relevance at this point because although not part of the prima facie case made relevant by statute, it involves the well-being not only of an innocent rejected sibling, but also the best interests of the girls whose future we are called upon to consider.
TERMINATION OF PARENTAL RIGHTS:
A THE fictions:
In the spectrum of those relationships coming before this court, the one surrounded by the most taboos and secrecy is that of adopting parent and child. We give effect legislatively to an almost ritual secrecy surrounding both the natural and adoptive families and perpetuate a legal fiction that "termination of parental rights” negates the very existence of a biological family. In reality, this phrase is nothing more than a label for the simple legal proposition that consent of a biological parent so adjudicated is not legally required for adoption (Domestic Relations Law, § 111). As the latest thinking bears out, the reality of his natural family is uppermost in the mind *372 of the adoptive child and his functioning as a person at peace with himself cannot go forward until his questions are answered and his psychological universe in order. In this age of increased enlightenment, the law is being geared in the direction of allowing sufficient factual matter about the lives of the parties to see the light of day toward the end that all concerned may learn to deal with these realities from the vantage point of their own insights. This trend is illustrated by legislation contemplating face to face confrontation between biological and foster parents (see so-called Scarpetta Laws, Social Services Law, §§ 383, subd 3; 384, subd 3; 392, subd 4; 400 and discussion in Matter of Ida Denise W, 77 Misc 2d 374 and in decisions illustrated by Matter of Raana Beth N, 78 Misc 2d 105, in which visitation was granted a biological parent in the very same order which "terminated” parental rights). Moreover, the veil of secrecy usually maintained in adoption proceedings has been lifted when its purpose has been found to bear no relevance to proceedings before the court (see Matter of Raana Beth N., supra). It is therefore possible to discern a new trend recognizing that termination proceedings as a prelude to adoption are simply a legal way of assuring a child’s psychological parents that no one will take him away.
These thoughts are necessary at this juncture because we are here faced with the reality of two girls who know the facts surrounding these proceedings; who have physically seen their biological parents as recently as during the pendency of this trial; who have as a reality a brother whose overwhelming motivation in life is a relationship with them and who are entitled to a relationship with him despite their immature fantasy that rejection of him will further their adoption by the foster parents. We are also confronted with the reality of prospective adoptive parents who know the biological parents and vice versa. In short, faced with these realities which are more or less unique, we must interpolate and innovate while staying within the letter and spirit of the law.
B HISTORY OF TERMINATION PROCEEDINGS:
The history of termination proceedings, or to be more accurate, judicially freeing a child for adoption, may someday be characterized as the road from Matter of Bistany (239 NY 19) to Matter of Bennett v Jeffreys (40 NY2d 543). These two decisions of the Court of Appeals stand as the outposts of what many saw as a tug-of-war between what they wishfully *373 thought to be legislative intent, sometimes expressed, sometimes not, and the steadfast refusal of the courts to allow a liberalization of the law without an unequivocal statement of legislative intent which the Legislature seemed unwilling to give.
In Matter of Bistany (supra, p 24) Mr. Justice Cardozo clearly enunciated the requirement that acts justifying judicial termination be "so unequivocal as to bear one interpretation and one only the parents manifested an intention to abandon the child forever.”
In Matter of Maxwell (4 NY2d 429, 433) the Court of Appeals again spoke of a "settled purpose to be rid of all parental obligations and to forego parental rights.”
While children were being frozen into situations where they could neither be adopted by their psychological parents nor returned to biological parents whom they did not know — or, worse, were in fact returned to natural parents who were entitled to custody even after many years lacking any finding of unfitness on their part, the move for legislative reform went forward and finally resulted in the enactment of the predecessor to section 611 of the Family Court Act in 1959 calling for a new proceeding known as permanent neglect.
Instead of liberalizing, the existence of the permanent neglect statute often had the opposite effect when courts undertook to read in its requirement of diligent efforts on the part of the agency into the already restricted abandonment proceedings contemplated by section 384 of the Social Services Law, a practice since struck down by the Court of Appeals in Matter of Anonymous (St. Christopher’s Home) (40 NY2d 96) on June 10,1976.
In the interim, because the law mandated return of a child to a parent not declared unfit, regardless of how long the child had lived with its nonblood psychological parents, terrible situations arose in which lives were literally wrecked by a failure to recognize the tremendous importance of persons who were parents in all respects other than ties of blood. Public awareness reached its zenith as a result of the uproar following the so-called "Baby Lenore” case, People ex rel. Scarpetta v Spence-Chapin Adoption Serv. (28 NY2d 185). The immediate result of this decision was enactment of the so-called "Scarpetta Laws” (Social Services Law, §§ 383, subd [3]; 384, subd [3]; 392, subd [4]; 400) giving at least some effect to *374 the rights of foster parents to receive notice and be heard in certain specified situations.
Because of certain changes in sociological thinking coupled with heightened public awareness of this problem, informed prognostications as to future judicial actions now entertained the possibility that the courts would soon be able to consider the best interests of a child and his psychological parentage unfettered by heretofore controlling considerations of blood such as are implicit in application of the doctrine that a child’s best interests ipso facto are served by being awarded to a biological parent lacking a showing of unfitness, a view expressed in Matter of Carla L. (77 Misc 2d 363) decided on February 26, 1974.
Immediately following this decision, on May 9, 1974, Matter of Susan W. v Talbott G. (34 NY2d 76) was decided by the Court of Appeals, once again enunciating the doctrine that a "flicker of interest” by the biological parent operated as a bar to freeing a child for adoption regardless of that child’s attachment to the psychological parent. This ruling was not surprizing in the context of prior law to which it adhered faithfully, but in that of stifling expectations that with lower courts following the "psychological parent” school of thought (see Goldstein, Freud, Solnit, Beyond the Best Interests of the Child) a relaxation of the stringency of prior judicial holdings might have been expected.
The legislative response to Susan W, instead of being a sweeping one, thus providing the unequivocal legislative statement of public policy not theretofore expressed, was a piecemeal amendment of section 611 of the Family Court Act and section 111 of the Domestic Relations Law to provide that insubstantial contacts (viz., evidence of "flicker”) shall not, standing alone, preclude a finding under that section. Even this enactment was soon rendered effectively impotent by holdings that it did not change the basic criteria enunciated in Susan W (See Matter of Rutkowsky, NYLJ, Feb. 23, 1976, p 11, col 4; Matter of Anonymous, 86 Misc 2d 93; Matter of Abraham L., 53 AD2d 669, 670.)
In the interim, an emerging trend of judicial thinking was giving increased recognition to the "psychological parent” school of thought expressed in the works of Dr. Anna Freud which was first cited judicially by our late colleague, the Honorable Jacob T. Zukerman in Matter of Catherine S. (74 Misc 2d 154). In this landmark opinion, Judge Zukerman *375 summarized the law as it stood and as it interlocked with the "psychological parent” school of thought and followed the latter after presenting a closely reasoned, rational argument in support of his judicial action.*
Matter of Catherine S. (supra) was cited by the Honorable Cesar H. Quinones in Matter of Confesora B. (75 Misc 2d 576) decided on June 19, 1973, in which, acknowledging his debt to Judge Zukerman’s thinking in Matter of Catherine S., he awarded custody of the subject child to the psychological parent as against the biological parent who was not claimed nor proven to be unfit. As Confesora B. made its way through the appellate process, ultimately resulting in affirmance by the Appellate Division (Matter of Confesora B., sub nom Benitez v Llano, 47 AD2d 566) and the Court of Appeals (Benitez v Llano, 39 NY2d 758) on April 27, 1976, the Temporary State Commission on Child Welfare, promulgated a report recommending a sweeping revision and/or recodification of concepts which was enacted into law almost contemporaneously with the Court of Appeals affirmance of Confesora B.
One final building block was required to complete this reordering of judicial thinking in view of the fact that the Court of Appeals affirmance in Benitez v Llano (supra) was limited by its own language to its specific unusual facts. This need for a sweeping comprehensive adjudication was soon met in Matter of Bennett v Jeffreys (40 NY2d 543, supra). (See companion cases Gomez v Lozado, 40 NY2d 839 and Matter of Malik M., 40 NY2d 840, in which the Court of Appeals now citing Benitez v Llano as dispositive of a general principle despite its own statement therein restricting it to its facts, finally recognized the best interests criteria and the psychological parent school of thought as the overwhelming and perhaps, in practical application, the only factor in deciding any case in which the future of a child is at stake.) Specifically, the Court of Appeals stated in sweeping language, which had the practical effect of obliterating statutory categorization, and, in the process, the application of many prior holdings (Matter of Bennett v Jeffreys, supra, p 552): "The nature of *376 human relationships suggests overall the natural workings of the child-rearing process as the most desirable alternative. But absolute generalizations do not fulfil themselves and multifold exceptions give rise to cases where the natural workings of the process fail, not so much because a legal right has been lost, but because the best interest of the child dictates a fnding of failure. ” (Emphasis added.)
It is possible to read into this, and one Appellate Division has apparently done so, judicial intent that regardless of whether or not statutory grounds for certain actions involving a child’s future are present, the existence of a psychological parent, or as phrased, the "best interests” of that child, would mandate certain judicial action on behalf of the child.
Matter of Bennett v Jeffreys (supra) was decided on September 21, 1976 during the pendency of this litigation and in fact at a time after the trial commenced and when a continuance for completion was in effect. Because of its obvious dispositive import in the litigation in progress, the court took the unusual step of having copies of that opinion sent to all counsel with an accompanying directive that they be ready for argument on the continued date as to how, if at all, it would affect the progress of the trial.
It was the court’s ruling given effect at the trial that Matter of Bennett v Jeffreys mandated consideration at the fact-finding hearing itself, prior to fact finding — and only on a limited basis — of the best interests of the children. In other words, the dichotomy of the permanent neglect proceeding in which only evidence of a prima facie case is presented at the initial fact-finding hearing (Family Ct Act, § 622), and social and psychological background material at a separate dispositional hearing when, as and if a finding is made at the first hearing (Family Ct Act, § 623) was now to be subject to a certain overlap, the extent of which the court could not gouge from the high court’s language in Matter of Bennett v Jeffreys (supra). It was the ruling of the court which is here repeated as a guide for the future, that only evidence concerning the child in question (viz., psychological testing and reports) would be received, with other dispositional material awaiting the proper hearing at the second stage of proceedings (Family Ct Act, § 623). This approach appears to have been ratified by the Appellate Division, Second Department, in Matter of House v Barbara J. (55 AD2d 604) where a dismissal in a permanent neglect case under the section we consider herein was re *377 turned to the Family Court for reconsideration of the best interests of the child in the light of Matter of Bennett v Jeffreys.
We hold therefore that the import of Matter of Bennett v Jeffreys is to mandate a limited consideration of the best interests of the child at the fact-finding stage and that the line of demarcation between the two separate hearings contemplated by sections 622 and 623 of the Family Court Act has been judicially erased, to an extent yet to be determined by appellate holdings. At this stage, lacking any other guide, we hold that any consideration of the child’s best interests at the fact-finding hearing over and above that permitted herein would infringe upon the statutory scheme contemplating a separate dispositional hearing. We are still of necessity, unsure of the ultimate effect this line of authority will have on the statutory privilege against consideration of dispositional matter as contained in section 625 of the Family Court Act, but we prognosticate that with such changes effectuated in the statutory scheme, appellate authority should be forthcoming relatively quickly as a result of clarifying litigation.
FINDINGS OF FACT:
The court finds:
1. That the respondent biological father has permanently neglected each of his daughters Michelle and Patricia within the meaning of section 611 of the Family Court Act by failing "for a period of more than one year following the date said child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with * * * the child”.
2. That the respondent biological father has failed to "plan for the future of the child, although physically and financially able to do so”. (Family Ct Act, § 611.) The court finds that respondent’s credibility is highly suspect in the light of numerous contradictions, evasions, and the failure to testify correctly concerning even such minor details as the date of his own divorce or those of his own children’s births. The court further finds that his purported "plans” to take the children— to find an apartment — to take a meaningful job — are a tired albeit vigorous repetition of exactly the same "plans”, the same apartment, the same job he submitted years ago, which were not remotely close to execution then or now.
*378 3. The court finds that, as conceded on record, the performance of the agency in carrying forth its duty to make "diligent efforts to encourage and strengthen the parental relationship” (Family Ct Act, § 611) left much to be desired. That in point of fact, the hasty determination that same would be "detrimental to the moral and temporal welfare of the child” (Family Ct Act, § 611) was reached mainly on the basis of the fact that the foster parents were desirous of adopting the girls and was a value judgment of the caseworker who was new to the case relying solely on the case record. Whether one looks to the discipline of law or to that of social work, both of which should ideally fuse in this court, this determination flew in the face of the agency’s obligation, in the exercise of simple humanity, not to permit a situation to develop whereby the foster parents and the girls would build up that intensity of feeling where removal of the girls would be psychologically devastating to them. In short, the agency failed to keep a valve on this situation such as would have constantly impressed upon these foster parents that their relationship with the girls was temporary. Nevertheless, this is water under the bridge. The court must decide upon criteria effectuating the children’s best interests and not punitively in response to the agency’s deficient performance. In the long run, we must consider that the father’s "plans” were centered around one of two possibilities: (A) Return of the girls to a home consisting of a biological father who elected not to see them on the very occasions during which he accompanied his paramour to see her children at the same place where he could have seen his own; his paramour who would not care for her own children in voluntary placement; housed in totally inadequate surroundings; or, (B) Return to him for care, not by him, but by his mother. Under these circumstances the court finds that building up a relationship involving needless hurt to the children by giving them expectations which would not be met would have been a destructive course of action. In short, the correct decision was reached for the wrong reasons.
4. That in consequence of the foregoing, the children Michelle and Patricia Ann are adjudicated to be permanently neglected children within the meaning of section 611 of the Family Court Act.
5. That a dispositional hearing pursuant to section 624 of the Family Court Act shall go forward on the date to be set herein.
*379 perspective:
The overwhelming motivation of the court in providing for the best interests of Michelle and Patricia Ann is that they have a meaningful relationship with their brother. Perhaps this would not be as strong if these siblings were not aware of each other and might not have to deal with the reality of being cut off by any action of this court giving its imprimatur to this unnatural severance. But these girls have some recollection of their prior lives, if only a hazy one, and they will ultimately have to come to terms with their unnatural circumstances engendered by the failures of so many adults who should have been more than they were. In the final analysis, when these children become adults, they will have only each other to depend on. This concept has been given legal effect by the Court of Appeals in Obey v Degling (37 NY2d 768, 771) where the court stated: "Young brothers and sisters need each other’s strengths and association in their everyday and often common experiences, and to separate them unnecessarily, is likely to be traumatic and harmful. The importance of rearing brothers and sisters together, and thereby nourishing their familial bonds, is also strengthened by the likelihood that the parents will pass away before their children.”
order:
With these children having been adjudicated as permanently neglected, the statutory dispositional hearing is the next order of proceedings. The court directs that it take place before the undersigned no sooner then six months from this date to be set by the court and counsel. In the interim, the agency is directed to formulate and submit a plan to the undersigned for approval at the time of the abandonment proceeding against the biological mother. This plan shall provide for the integration of Wayne Michael into the lives of his sisters on a meaningful basis on no less than two occasions during each interim month. This shall include Wayne’s visits at the home of the girls, a plan approved in principle by the foster parents in conference; and such visits by such other relatives as the agency in the practice of forward-looking casework shall include in the scheme of things. These objectives require real innovation by the agency and present a challenge to the skills of even the best caseworkers and the court has every confidence that they will be equal to the intensity of commitment required.
*380 So that there will be no misunderstanding, it is the court’s intention if at all possible, and depending on the success of this plan, to leave the girls where they are and lacking any persuasive evidence to the contrary, to enter an order permitting these excellent, forward looking foster parents to legally formalize their feelings for these girls which are obviously reciprocated in kind. The court cautions however, that should there be any lagging on interim plans of integrating Wayne Michael into the scheme of things, — and should this default be attributable to any source other than the biological father or his family — it will reluctantly consider other alternatives on disposition which would give effect to establishing this sibling relationship. The agency is advised that this is the time for it to be as forward looking as the foster parents and to leave dogmas behind. The father is admonished that his co-operatian is vital — that his failures, perhaps unintentional, have brought us to this unhappy point — that this plan and ultimate disposition along the lines proposed offers the best opportunity for self-realization to his three children by making the best of a situation they did nothing to create. It is hoped he will cooperate and seize this opportunity to be unselfish. If he fails to do so, no one can compel his good faith, but he will have to live with the knowledge that his failures have not only lost him his daughters but that he has deprived his son of his sisters as well.
The agency shall submit monthly written progress reports directed to the undersigned with copies to all counsel.

 If granted the opportunity to choose his own memorial, there is no doubt that our late colleague, Judge Zukerman would wish to be remembered as the forward looking jurist so far ahead of his time whose pioneer judicial recognition of the psychological parent school of thought ultimately became the law of this State. The impact of this doctrine will open the lives of literally thousands of children hanging in hopeless limbo in homes other than those of their natural parents. This fitting memorial somewhat tempers the sadness over his untimely death.