OPINION OF THE COURT
Gertrud Mainzer, J.
In this adoption proceeding filed on July 8, 1980 by Dennis and Dorothy P. the court signed an order of adoption which included a provision that the adoptive child have continued contact and visitation with his biological siblings (hereinafter the birth siblings). Recognizing that some decisions have held it to be beyond the authority of the court to provide for visitation with members of the biological family (hereinafter the birth family) after adoption,[1] this court felt compelled to set forth its reasoning in a written decision. However, in order not to delay this adoption any further[2] the court informed all parties that a supplemental decision would be written addressing this legal issue.
The pertinent facts are as follows:
Anthony, the adoptive child, was born on April 9, 1969. He was the fourth child of Barbara B. and William R., his putative father. The records of the Children’s Aid Society, *27 the agency having custody and guardianship of Anthony, indicate that William R died on December 22, 1969. The cause of death stated in his death certificate was fatty liver attributed to chronic alcoholism. Subsequent to the death of William R, Anthony’s mother married Robert K.
Anthony was first placed in a shelter boarding home on September 12, 1969. At that time, his mother, who was alleged to be emotionally unstable was unable to care for him. On November 25, 1970, when Anthony was 18 months old, he was placed with his present family, with whom he has continuously resided. On September 3, 1975 the parental rights of both Anthony’s mother and Robert K. were terminated under section 384 of the Social Services Law.
Anthony’s three older birth siblings had been previously freed for adoption. All three were placed with and adopted by the same foster family. At the time Anthony came into placement, the foster family who adopted his birth siblings was unable to accommodate another child and, consequently, Anthony was placed in his present adoptive home.
Despite the separation from his birth siblings, Anthony has maintained an ongoing relationship with them. He has visited them and been in phone contact with them up to the time this proceeding was filed. Anthony knows their adoptive name and address. The Children’s Aid Society, following sound agency policy, as well as Anthony’s adoptive parents have encouraged and supported Anthony’s relationship with his birth siblings.
After finding that all formal requirements for Anthony’s adoption had been met and after examining the background of Anthony’s adoptive and birth families, this court discussed Anthony’s contact with his birth siblings with all parties. Both the agency and the adoptive parents agreed that Anthony’s relationship with his birth siblings was most important to Anthony’s well-being and should be continued. However, the agency maintained that such contact be continued on an informal basis or, alternatively, that a letter of consent by the adoptive parents be attached to the adoption order. After considering both proposals, this court found that neither arrangement would adequately safeguard Anthony’s interests. While the adoptive *28 parents may presently feel that Anthony’s contact with his birth siblings is essential, Anthony’s interests would not be protected should his adoptive parents change their minds in the future. Therefore, this court determined that the only way to ensure Anthony’s interests after his adoption was to include a direction in the order of adoption that Anthony have continued contact including visitation with his birth siblings.
This court is well aware of the legal consequences of adoption as defined in section 117 of the Domestic Relations Law providing for the termination of parental rights and obligations of the birth parents and the creation of such rights and obligations in the adoptive parents. Section 114 of the Domestic Relations Law further provides that an adoption order shall be approved only if the Judge or Surrogate is satisfied that the best interests of the child will be promoted by the adoption. Though the adoption procedure is primarily intended to promote the welfare of children, the statute nowhere specifically defines the interests to be considered by the court, nor are there any provisions to ensure that such interests will be protected after the child’s adoption. In this regard, it has been increasingly recognized that the concept of an “open adoption”, one in which contact, including visitation, is permitted between the adopted child and members of his birth family may serve to promote the best interests of the child in certain cases and should be available as an alternative form of adoption.[3]
In the past, the typical adoption involved an infant, usually illegitimate, who was taken into the adoptive home with no previous relationship or contact with his birth family. In such cases, adoption was conceptualized as a complete substitution of one family by another - and secrecy in the adoption was primarily intended to protect the child against the stigma of illegitimacy and to guarantee an undisturbed family environment.
Significant social changes have occurred, however, which have undermined many of the traditional assump *29 tians upon which adoption practices are based. In the last decade the number of infants surrendered for adoption at birth has been steadily decreasing. The greater use of birth control, the legalization of abortion and changing social attitudes have all contributed to this decline.[4] The social stigma attached to illegitimacy has lessened and many unwed mothers now keep their babies.[5]
While the number of infants being adopted at birth has been decreasing, there has been an increase in the number of older children now being adopted.[6] The high rates of divorce and remarriage have been accompanied by an increase in stepparent adoptions of older children. In addition, there has been an increase in the number of foster children now being adopted by their foster parents.[7] Many of these children have lived in foster care for extended periods, are older and have physical or mental handicaps.[8] In these adoptions, secrecy is not only frequently impossible, but often inadvisable since these children remember their past and have emotional ties to their birth families.
Research by psychiatrists and psychologists has also revealed the importance of a child’s links to known ancestral, religious, ethnic and cultural backgrounds.[9] Recent, studies indicate that shrouding a child’s background in an air of mystery, even for a child adopted at birth, can cause psychological harm, retarding emotional development and *30 self-identity.[10] Moreover, in a longitudinal investigation of foster care,* [11] Professors David Fanshel of Columbia University and Eugene B. Shinn of Hunter College found that the intellectual, psychological and physical development of children in long-term foster care was enhanced by visitation and contact, however minimal, with the biological family. Although no studies are available for adopted children, it seems likely that visitation with members of a child’s birth family after adoption would be similarly beneficial. Furthermore, the need to know family medical history for the diagnosis, prevention and treatment of congenital diseases[12] as well as for family planning is now widely recognized. Many genetic illnesses are not apparent at birth. Others do not occur until adult life. In such instances continued contact with the birth family and knowledge of their medical history may be essential.
In view of these developments the need for and the advantages of an open adoption are clear. This concept offers an enlightened alternative for dealing with those situations in which the traditional adoption would be inappropriate. Accordingly, where adoption cannot be a total replacement of the birth family, but rather a legal means of assuring the adoptive parents and the child that their relationship is permanent, an open adoption may guarantee this permanency without unnecessarily severing important relationships with known members of the child’s birth family existing prior to the adoption.[13]
Although open adoptions are not specifically authorized by statute, there is legal precedent supporting the proposition that the court has the necessary authority to provide *31 for visitation between the adopted child and members of his birth family where such visitation is in the best interests of the adopted child and does not unduly interfere with the adoptive relationship. That the court has such power was recognized as early as 1917 in Matter ofMcDevitt (176 App Div 418) where a mother was granted visitation rights with her child following adoption. There the court held that ample power exists at law and in equity to promote the welfare of the child, notwithstanding a legal adoption.
More recently it was held that a Surrogate has equitable jurisdiction to make orders of visitation incident to an adoption proceeding. (Matter of Raana Beth N., 78 Misc 2d 105.) In that case, a five- and one-half year-old child who was adopted by her stepfather was permitted to visit her birth father. The court found that although it was preferable for the child to become a full member qf her mother’s and stepfather’s family through adoption, visitation with the birth father would be beneficial to the child and should be continued. (See, also, Matter of Widrick, 25 Misc 2d 1078 [an adoption of children by their stepfather would not divest the natural father of his visitation rights].)
In Matter of Patricia A. W. (89 Misc 2d 368) the court addressed the issue of visitation between siblings. There a petition was brought to terminate the parental rights of a father who had two girls, ages 7 and 9, who were in foster care and an older boy, age 11, who lived with a grandparent. The boy expressed a strong desire to maintain his relationship with his sisters, despite their separation. The court ordered parental rights terminated but preserved visitation rights between the boy and his sisters.
Finally and most recently in People ex rel. Sibley v Sheppard (54 NY2d 320) the Court of Appeals affirmed an order of the Supreme Court permitting a grandparent visitation with her grandchild despite the child’s adoption and the objections of the adoptive parents.[14] In doing so, the Court of Appeals recognized that an adoption does not *32 automatically sever all contacts between the adoptive child and members of the birth family and that the court has the authority to preserve such contacts when necessary to protect the best interests of the child even when opposed by the adoptive parents.
Before this court is a 12-year-old child who knows the facts surrounding his adoption, who has visited and maintained a relationship with his siblings over the years and who strongly desires to continue his relationship with his siblings. The adoptive parents and the child’s birth siblings know each other. Thus, there are no privacy concerns here, nor are there any claims that visitation between the child and his birth siblings will hinder the adoptive family unit. Indeed, the adoptive parents admit that it is in the child’s best interests to continue to visit his birth siblings. In light of these facts this court finds that contact and visitation with his birth siblings is necessary to promote Anthony’s best interests and furthermore finds that this court has the necessary power to order this adoption with the direction that Anthony have continued contact including visitation with his birth siblings.

. See, e.g., Matter of Suzanne N. Y. (66 AD2d 723); Matter of Catala (57 AD2d 823); Matter of “Benjamin” (93 Misc 2d 1084); Matter of Erik D. (NYLJ, Dec. 5,1978, p 12, col 3) wherein it was implicitly held that Family Court is without authority to order visitation after parental rights were terminated even when it would be beneficial for the child.

. This matter was initially delayed when petitioners withdrew the proceeding on October 27, 1980, reinstating it eight months later on June 29, 1981.

. See, e.g., Report by the Committee on Family Court and Family Law, Visitation After Adoption: An Additional Alternative (Feb. 1981 [unpublished]).

. See Report Concerning Disclosure of Adoption Records to an Adopted Child at Age 21, Temporary State Commission on Child Welfare, Senator Joseph R. Pisani, Chairman, March, 1976 (hereinafter Pisani Report).

. According to Sorosky in The Adoption Triangle (Anchor Press, N. Y., 1978, p 207) approximately 94% keep their babies rather than place them for adoption. (See, also, New York Times, Births to Unmarried Women Rose 50% in Last Decade, Oct. 26,1981, p Al, col 3.)

. Pisani Report (p 32).

. Because of the financial aid offered in subsidized adoptions (Social Services Law, § 398) and the more relaxed standards for terminating parental rights (Social Services Law, § 384-b; Family Ct Act, art 10, and recent amendments) foster parents today are more likely to adopt their foster children.

. In 1975, 50% of all adoptions involved foster children who were older. (Pisani Report, p 32.)

. Benet, The Politics of Adoption (Foreword by Lifton, Free Press, N. Y., 1976); Lifton, Twice Born: Memoirs of an Adopted Daughter (McGraw-Hill, N. Y., 1975); Lifton, Lost and Found (Bantham, N. Y., 1981); Baran, Pannor, Sorosky, Open Adoption, Social Work (vol 21, pp 97-100 [1976]); Baran, Pannor, Sorosky, The Adoption Triangle (Anchor Press, N. Y., 1978).

. Id.

. Fanshell, Shinn, Children in Foster Care (Columbia University Press, 1978).

. There are approximately 2,000 genetic diseases. Examples of the more common diseases are sickle cell anemia, thalassemia, Huntington’s disease, hemophelia and Wilson’s disease.

. The most recent amendments to the New Jersey adoption statute incorporates the requirement that due regard be given to the rights of all persons affected by an adoption and provides for the termination of all rights between the adopted child and his parents, as well as the rights of any person which are derived from that parent-child relationship except such rights which have vested prior to the entry of the order of adoption. (NJ Stats Ann, §§ 9:3-37, 9:3-50.) These provisions have been applied to permit continuing contact between the adopted child and members of his birth family where such relationships *31 were established prior to the child’s adoption and are beneficial to the child.

. While section 72 of the Domestic Relations Law specifically provides a grandpar *32 ent with a right to seek visitation with a grandchild where either or both parents of the ' child are deceased, the principles enunciated by the Court of Appeals are applicable to other family members even where no such statutory provision exists.