TIMOTHY R. MORSE AND SHERRY L. MORSE, APPELLANTS AND CROSS-RESPONDENTS, v. JUANITA DALY, RESPONDENT AND CROSS-APPELLANT.

No. 16054

August 20, 1985                                    704 P.2d 1087

[Rehearing denied December 12, 1985]

*Wiener, Waldman & Gordon,* Las Vegas; *Diehl, Evans & Associates,* Fallon, for Appellants and Cross-Respondents.

*Goodman, Terry, Stein & Quintana,* Las Vegas, for Respondent and Cross-Appellant.

## OPINION

By the Court, GUNDERSON, J.:

In the instant appeal, Timothy R. Morse and Sherry L. Morse (the Morses) question the district court's power to condition a decree of adoption, which granted the Morses' petition to adopt a child named Marcus Daly Lamb, by reserving jurisdiction to consider a possible future request for visitation privileges by Juanita Daly. The Morses contend that a Nevada court, in an adoption proceeding, has no power to consider whether a child's best interests will be served by allowing the child to visit with others. Mrs. Daly, Marcus Daly Lamb's "step grandmother" or "grandmother by marriage," contends that the district court acted properly when it reserved jurisdiction to consider a petition for visitation at some future date. We agree with Daly and, for the reasons discussed in this opinion, we affirm the district court's order.

This case presents the second occasion on which this court has been called to consider whether, by virtue of her viable relationship with her deceased husband's grandson, Daly is entitled to have her desire for visitation rights considered by the district court. In Daly v. Morse, 99 Nev. 532, 665 P.2d 797 (1983), we decided this issue in the context of litigation between Daly and William R. Morse, the child's personal guardian. The elder Morse had placed the child, who is the beneficiary of a substantial estate, in the physical custody of his son and daughter-in-law, the respondents herein. The latter refused to allow the child to continue visiting with Daly and, in the litigation thus precipitated, this court held that the district court had jurisdiction to consider Daly's petition for visitation, by virtue of the court's "power to regulate, control, deny or modify the guardianship over Marcus Daly Lamb." 99 Nev. at 535, 665 P.2d at 798. Then, after this court filed its decision, but before the district court could act upon it, the Morses petitioned the district court to adopt the child.

The district court consolidated the Morses' adoption proceeding for hearing with Daly's petition for visitation. After taking evidence, the court granted the adoption petition, which Daly had not unqualifiedly opposed. Daly's stance was that, although the child's interests might be served by allowing the adoption, she

also had something important to offer the child. Thus, she contended, the adoption should only be granted if the child's right to visit with Daly were to be preserved, and the district court evidently agreed. Although the court denied Daly's petition for immediate visitation, it incorporated in the adoption decree a reservation of jurisdiction to consider visitation rights again at some future time. The court specifically determined that this disposition would serve the best interests of the minor child. The Morses have appealed.

## *The Facts*

Before addressing the legal issues, a brief review of the pertinent facts is necessary. For the most part, the evidence is not in dispute. In any case, because Daly prevailed in regard to the matter now under review, we must accept as established all facts which evidence tends to prove in her favor, and must accord to Daly the benefit of all inferences which may reasonably be drawn from such evidence. Alex Novack & Sons v. Hoppin, 77 Nev. 33, 42, 359 P.2d 390, 395 (1961).

While married to Kathryn Daly, Marcus Daly III fathered a child, Candace Marie, with another woman. He and Kathryn adopted the child, and, upon their divorce, the court awarded Kathryn custody. In December of 1958, Marcus married Juanita Daly, who remained his wife until his death in November, 1970. During her minority, the Dalys had physical custody of Candace in the summer months.

Marcus Daly Lamb was born to Candace and her husband, Earl Lamb, in July of 1978. Earl Lamb died in February, 1979; Candace died in June, 1981. Candace's will designated William R. Morse as Marcus' guardian, and he was appointed as such by court order. Mr. Morse arranged for the placement of Marcus in the Las Vegas home of his son and daughter-in-law, Tim and Sherry Morse, as compensated foster parents.[1]

Soon after Daly learned that young Marcus was residing in Las Vegas, where she lives, she made arrangements to visit with him. Daly testified she "was just happy to get to give to him love that a grandparent could give to a child." Daly said that she and young Marcus had a "good time together" on their visits. Marcus called her "Grandma" at first, then "Neenie." Sometimes they would "ride double-seated bicycles together"; she also bought him a bicycle of his own. On most of their visits, Daly shared with

---

[1] William R. Morse testified that his son and daughter-in-law were paid nearly $43,000 for their care of Marcus from June 12, 1981, to May 31, 1983.

Marcus as much of his family heritage as she believed a child of his age could understand. There was, she felt, an unexplainable "transmission of love" between her and the child.

Daly testified that, after she had been visiting with Marcus for about six months, Sherry Morse suddenly and unexpectedly declared that she could no longer visit with the child. Sherry relayed to Daly that William R. Morse had decided there could be no further visitation until Daly called him to explain what her "intentions" were, what "role" she planned on playing in the child's life, and what she "wanted" from Marcus. Apparently because of some distrust of William R. Morse by Daly, due to attorney fees he had collected from the estate of Candace and through the guardianship, Daly did not wish to speak with him. Nonetheless Daly, an affluent person in her own right, had her personal secretary telephone Morse's office to try to arrange for continued visitation with the child. Her communications were not returned; hence, she petitioned the district court.

At the consolidated hearing ultimately held following our first decision, Daly testified that "I can give [Marcus] a great deal of love. And I can give him an extension of the heritage of the Daly family that I have been blessed to have." She said that all she wanted from Marcus is "a good life for him." Since June, 1982, however, Daly has not been allowed to visit with Marcus.

The Morses do not appear to contend Daly is unfit or undesirable, so that association with her would injure the child. Indeed, they evidently do not contest the district court's factual finding that the child's best interests will be served by preserving the potential for future visitation with Daly. Their claim of error apparently is purely legal and technical. The district court, the Morses contend, simply has no authority when granting an adoption to make any provision for visitation by persons other than the adoptive parents—no matter how much such visitation might serve the child's interests. Thus, the Morses assert in effect, they may accept the part of the district court's decree which permitted them to adopt Marcus Daly Lamb, and then on appeal request this court to strike the provision that determined the child's best interests will be served by reserving jurisdiction to consider future requests for visitation. We turn to consider the issue thus raised.

## The Legal Issue

We note initially that nothing in Nevada's adoption statutes or in our case authority precludes a district court from incorporating within an adoption decree an order for visitation, if the court finds it to be in the child's best interest. We have previously

recognized that "[t]he main purpose of adoption statutes is the promotion of the welfare of the children, bereft of the benefits of the home and care of their real parents." Mendive v. District Court, 70 Nev. 51, 58-59, 253 P.2d 884, 887 (1953). Because the district court's order is founded on the promotion of the welfare of young Marcus, and is not precluded by statute or case authority, we therefore think it is within the court's inherent equitable power. Even though such an exercise of the court's power has not previously been questioned through litigation before us, such orders have been approved in a number of other jurisdictions.

For example, in New York it has been decided that a family court has jurisdiction to enter an order of adoption which includes a provision allowing an adoptive child to have continued contact and visitation with his biological siblings. Even though the would-be adoptive parents had advised the family court that they intended to permit such visitation voluntarily, it was determined the best interests of the child would be served by incorporating an explicit provision for visitation in the adoption decree. The child, the court said, should be protected from the prospect that the new parents might later change their minds. Matter of Adoption of Anthony, 448 N.Y.S.2d 377, 378 (Fam.Ct. 1982).

In its well-reasoned opinion, the court went on to note its awareness of psychological data indicating that, when children like Marcus are adopted by foster parents, their best interests are typically served by continued contact with members of their existing families. As the court said:

> Research by psychiatrists and psychologists has also revealed the importance of a child's links to known ancestral, religious, ethnic and cultural backgrounds. Recent studies indicate that shrouding a child's background in an air of mystery, even for a child adopted at birth, can cause psychological harm, retarding emotional development and self-identity. . . . Accordingly, where adoption cannot be a total replacement of the birth family, but rather a legal means of assuring the adoptive parents and the child that their relationship is permanent, an open adoption may guarantee this permanency without unnecessarily severing important relationships with known members of the child's birth family existing prior to the adoption.[2]

448 N.Y.S.2d at 379-80 (footnotes omitted).

---

[2]We realize, as the New York court surely did in the case it considered, that the case before us does not present an "open adoption" situation as that concept is generally defined.

> An open adoption occurs when, prior to the adoption, it is agreed in writing that the child will have continuing contact with one or more members of his or her biological family after the adoption is completed . . . The court would approve the agreement if it could be shown that

The New York court recognized that incorporating visitation orders within an adoption decree is not explicitly authorized by statute in New York, but it located the "necessary authority" to fashion such an order in the court's power "at law and in equity to promote the welfare of the child." 448 N.Y.S.2d at 380.[3] Because its order granted an adoption, the court recognized that it should not only consider the best interests of the child, but also determine that the visitation "does not unduly interfere with the adoptive relationship."[4] *Id.*

this was in the child's best interest. The agreement would then be incorporated into the . . . final order of adoption. The court would maintain jurisdiction as in a divorce proceeding and could modify the agreement if necessary for the child's welfare.

Amadio & Deutsch, *Open Adoption: Allowing Adopted Children to "Stay in Touch" With Blood Relatives,* 22 J.Fam.L. 59, 60-61 (1983) (footnote omitted).

The case before us does not present an "open adoption" because the parties have not agreed to continuing visitation. Nonetheless, the inherent power of the lower court to incorporate into an adoption decree a visitation order for its future consideration is not unlike the exercise of power by courts which have granted open adoptions.

[3]The New York court also noted that in Matter of Raana Beth N., 355 N.Y.S.2d 956 (N.Y.Surr.Ct. 1974), an earlier court had held that it had "equitable jurisdiction to make orders of visitation incident to an adoption proceeding." 448 N.Y.S.2d at 380. "That the Court has such power was recognized as early as 1917 in Matter of McDevitt, 176 A.D. 418, 162 N.Y.S. 1032 (2nd Dept. 1917), where a mother was granted visitation rights with her child *following* adoption." *Id.* (Emphasis added.) In fact, a court's power to grant visitation orders *subsequent* to adoption proceedings is not uncommon in this country. *E.g.,* Welsh v. Laffey, 474 N.E.2d 681 (Ohio App. 1984); Lingwall v. Hoener, 464 N.E.2d 1248 (Ill.App. 1984); Reeves v. Bailey, 126 Cal.Rptr. 51 (Ct.App. 1975); Scranton v. Hutter, 339 N.Y.S.2d 708 (App.Div. 1973). *See generally* Note, *Visitation After Adoption: In The Best Interests of The Child,* 59 N.Y.U.L. Rev. 633 (1984).

[4]The New York court realized that this two-part test should not be applied to exclude visitation merely because visitation is opposed by the adoptive parents. The court noted that in Peo. *ex rel.* Sibley v. Sheppard, 429 N.E.2d 1049 (N.Y.Ct.App. 1981), New York's highest court had affirmed a lower court's order

permitting a grandparent visitation with her grandchild despite the child's adoption and the objections of the adoptive parents. In doing so, the Court of Appeals recognized that an adoption does not automatically sever all contacts between the adoptive child and members of the birth family and that the Court has the authority to preserve such contacts when necessary to protect the best interests of the child *even when opposed by the adoptive parents.*

448 N.Y.S.2d at 380 (footnote omitted) (emphasis added).

Similarly, merely because the Morses are opposed to Daly's visitation with Marcus does not mean that visitation will not serve the child's best interests at some time in the future.

Quite similarly, in the case before us, the district court considered all of the Morses' objections and concerns, and nonetheless determined expressly that the child's best interests justified its reservation of jurisdiction. Those best interests, the court evidently believed, may be advanced if, at a later date, Daly is afforded a further opportunity to offer her husband's grandson her own grandmotherly love and comfort, as well as her knowledge of the Daly family heritage.

In a like case, a New Jersey court recognized an equitable jurisdiction to incorporate within an adoption decree a provision for visitation by the child's natural father. Matter of Adoption of Children by F, 406 A.2d 986 (N.J.Super.Ct.Ch.Div. 1979). As with Daly in the instant case, the father did not oppose the adoption, but sought to assure that the child could continue to see him.[5] In reaching its decision, the court noted that, as did Daly in the instant case, the father had enjoyed a viable relationship with the children, before his prior contacts with the children were frustrated by the children's natural mother. 406 A.2d at 989. Thus, to promote the best interests of the children, the court not only required visitation as an incident of its adoption decree, but further exercised its equitable powers by appointing a guardian *ad litem* to enforce the visitation order. *Id.*

Again, while considering the claim by grandparents for visitation with a child adopted by a stepfather, a California Court of Appeal held that it is a "question of fact as to whether such visitation rights would be in the best interests of the minor child and would not unduly hinder the adoptive relationship." Roquemore v. Roquemore, 80 Cal.Rptr. 432, 435 (Ct.App. 1969). In so holding, the court recognized that:

> [u]nquestionably the substitution of adoptive for natural parents serves a great number of social objectives. On the other hand the law should not and cannot ignore the fact that an adopted person may not in many respects be cut off from his natural family. If affection and regard remains between members of a natural family, the law should not in the name of consistency undertake to thwart the expression of those feelings when the encouragement thereof does not hinder the adoptive relationships.

80 Cal.Rptr. at 434 (citation omitted).

In another recent case, a different division of the California

---

[5]While Mrs. Daly argues on appeal that the legal guardian's consent to the adoption was legally invalid because of an alleged interest by William R. Morse in the adoption proceeding, we do not construe either this argument or her similarly based assertion before the court below as a refusal to consent to the adoption.

Court of Appeal characterized the decision just discussed as recognizing that visitation should be available "as a flexible device to promote the child's welfare." Reeves v. Bailey, 126 Cal.Rptr. 51, 56 (Ct.App. 1975).

We agree. This flexible device, when properly utilized within an adoption decree, not only can promote the best interests of the child but need not unduly impinge on the adoptive parents.

Accordingly, we hold that the adoption decree in the instant case—which was conditioned upon the court's reservation of jurisdiction to consider visitation rights in the future, and which was based upon an express determination of the child's best interests—was within proper exercise of the court's equitable powers.

We also have considered Daly's contention that William R. Morse's consent to the adoption was invalid, and have determined that it lacks merit. The district court's decision is therefore affirmed in all respects.[6]

SPRINGER, C. J., and STEFFEN and YOUNG, JJ., concur.

---

[6]JUSTICE JOHN C. MOWBRAY recused himself, and took no part in the decision of this case.