*263 OPINION OF THE COURT
Guy P. De Phillips, J.
A joint decision is rendered in these two disparate proceedings to resolve a common legal issue of much concern to the Bench and Bar, to wit, the meaning and legal implications as to enforceability of the recent new legislative pronouncement contained in Social Services Law § 383-c entitled "Guardianship and custody of children in foster care”, effective January 1, 1991. Under docket No. B7403/92, petitioner the Catholic Home Bureau for Dependent Children seeks to terminate the parental rights of the respondent mother Lyssette C. on the ground of permanent neglect, and of the respondent putative father Frankie T. on the ground of abandonment. At fact finding on inquest as to the mother, petitioner proved permanent neglect by clear and convincing evidence. The petition was withdrawn with respect to the putative father without prejudice in that the respondent putative father determined to execute a judicial surrender. The foster parent, the putative paternal grandmother was present. The court appointed counsel to represent the foster parent. Both the foster parent and the putative father gave their consent on the record to the terms of the judicial surrender. The surrender provides in pertinent part: "Upon execution and acknowledgement of this surrender, the parent is giving up all rights to have custody, visit with, speak with, write to or learn about the child, forever, unless the parent and the authorized agency have agreed to different terms as written in this surrender * * * I, Francisco T., the father of Alexandra C. understand that the terms and conditions, if any, agreed upon by all the parties, are: 1. Said child to be adopted by current kinship foster mother, Herminia T., 2. Biological father shall retain visitation rights upon such terms and conditions as mutually agreed to by Francisco T., the father, and Herminia T., the adoptive parent.”[1] The court was advised that due to the uncertainty surrounding the legal efficacy of the retention of visitation rights, some courts refuse to accept judicial surren *264 ders containing such terms. The court, taking note of Social Services Law § 383-c, opined that counsel was entitled to make a record with respect to the court’s determination to exercise its discretion to approve or disapprove of the surrender as drafted so as to afford appropriate appellate review of the exercise of discretion, if sought.[2]
In docket No. A41/93, the applicant mother Melissa J. of the child Diamond J., who is in the custody of the Commissioner of Social Services of the City of New York, sought to execute a judicial surrender. The proposed surrender provided in pertinent part: "Upon execution and acknowledgement of this surrender, the parent is giving up all rights to have custody, visit with, speak with, write to or learn about the child, forever, unless the parent and the authorized agency have agreed to different terms as written in this surrender * * * I understand that surrender is conditioned on the adoption of said child by Mrs. J. (maternal grandmother) with visitation rights by biological mother”. The attorney for the Commissioner stated that he did not know whether the reservation of visitation rights was enforceable. Accordingly after discussion between counsel for the applicant and counsel for the Commissioner and with the mother’s approval, the clause "with visitation rights by biological mother” was stricken from the proposed surrender. The court advised the mother of her rights and that under Social Services Law § 383-c, she could request that the reservation of visitation be retained in the surrender. The applicant insisted on signing the surrender with the deletion of the language pertaining to visitation, observing that she trusted her mother, the foster parent, "to do the right thing.” The uncertainty surrounding these "conditional” surrenders mandates exposition by the court as to the present state of the law regarding "open adoptions.”[3]
*265 In Matter of Gregory B. (74 NY2d 77, 90-91 [1989]), the Court of Appeals observed:
"Finally, we are not unmindful of the psychological harm that may possibly result from severing the bonds between a child and his or her biological parent, particularly where the child is older and has strong emotional attachments to the birth family (see, Matter of Joyce T., 65 NY2d 39, 46, n 2, supra; see generally, Matter of Anthony, 113 Misc 2d 26). Such concerns have been increasingly well documented in recent years, prompting some to advocate 'open’ adoptions in which the court supplements an order of adoption with a provision directing that the adopted child have continuing contacts and visitation with members of his or her biological family (see, Matter of Anthony, 113 Misc 2d 26, supra; see generally, Davis, Use and Abuse of the Power to Sever Family Bonds, 12 NYU Rev of L & Social Change 557; Amadio and Deutsh, Open Adoption: Allowing Adopted Children to Stay in Touch’ with Blood Relatives, 22 J Fam L 59).
"We express no opinion as to whether such contacts generally would be helpful and appropriate once parental rights have been terminated and the child has been adopted into a new family or whether a court should have the discretionary authority to order such contacts. We note, however, that the 'open’ adoption concept would appear to be inconsistent with this State’s view as expressed by the Legislature that adoption relieves the biological parent 'of all parental duties toward and of all responsibilities for’ the adoptive child over whom the parent 'shall have no rights’ (Domestic Relations Law § 117 [1] [a]; Matter of Best, 66 NY2d 151). Although adoptive parents are free, at their election, to permit contacts between the adopted child and the child’s biological parent, to judicially require such contacts arguably may be seen as threatening the integrity of the adoptive family unit. In any event, 'open’ adoptions are not presently authorized. If they are to be established, it is the Legislature that more appropriately should be called upon to balance the critical social policy choices and the delicate issues of family relations involved in such a determination.”
In 1990, the Legislature enacted a new section, Social Services Law § 383-c, effective January 1, 1991 (L 1990, ch 479, § 2; as amended by L 1990, ch 480, §§ 1-3; L 1991, ch 588, § 1). This enactment provides for the commitment of the guardianship of the person and the custody of a child in foster *266 care under the age of 18 years to an authorized agency by a signed written instrument known as a "surrender”. The surrenders may be "judicial” or "extra-judicial”. In pertinent part the statute provides that the "written instrument which shall be known as a surrender [subd (1)] * * * shall be upon such terms and subject to such conditions as may be agreed upon by the parties thereto and shall comply with subdivision five of this section [subd (2)]”. Subdivision (5) states in paragraph (ii) "that the parent is giving up all rights to have custody, visit with, write to or learn about the child, forever, unless the parties have agreed to different terms pursuant to subdivision two of this section, and unless such terms are written in the surrender” (emphasis supplied). Further, when the parent appears before a Judge or Surrogate to execute and acknowledge a surrender, the Judge or Surrogate "shall inform the parent of the consequences of such surrender, including informing such parent that the parent is giving up all rights to have custody, visit with, speak with, write to or learn about the child, forever, unless the parties have agreed to different terms pursuant to subdivision two of this section” (subd [3] [b]; emphasis supplied).
With regard to extrajudicial surrenders, the authorized agency must file an application for approval of same with the court with supporting documentation which shall also include application declaring, inter alla, that the surrender was read in full to the parent in the parent’s principal language and the parent was given an opportunity to ask questions and obtain answers regarding the nature and consequences of the surrender. Notice must be given to the person who executed the surrender (subds 4, 5).
Domestic Relations Law § 117 (1) (a) provides: "After the making of an order of adoption the natural parents of the adoptive child shall be relieved of all parental duties toward and of all responsibilities for and shall have no rights over such adoptive child” (emphasis supplied). When enacting Social Services Law § 383-c, the Legislature failed to amend Domestic Relations Law § 117 to reflect a reservation of a right or rights in the surrender instrument as surviving the order of adoption (see, Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law C117:l, at 127). This oversight may impel the conclusion that the reservation of right in the surrender is illusory and that any surrender containing such reservation must be disapproved. In effect such judicial reasoning would "legislate” *267 Social Services Law § 383-c respecting agreement between the parties as to custody, visitation, verbal or written contact or right to learn about the child embraced within the terms of a surrender, out of existence. The legislative history of section 383-c is not particularly revealing other than a fixed focus on facilitating the freeing of foster care children for adoption and the ensuring that a parent makes a knowing and voluntary decision about surrendering a foster child for adoption. Greater flexibility was sought by the enactment for authorized agencies in relation to the process of surrendering foster children for adoption.
On information and belief this court has been advised that the absence of modifying language in Domestic Relations Law § 117 to reflect the reservation of rights explicit in Social Services Law § 383-c regarding such issues as for example visitation, has prompted some courts to refuse to accept any surrender containing such reservation despite the clear language of section 383-c authorizing that reservation. How then is the tension between Domestic Relations Law § 117 and Social Services Law § 383-c to be resolved.[4]
In construing Social Services Law § 383-c, the court is guided by the textual treatise on the construction and legal interpretation of the statutes enacted by the Legislature delineated in McKinney’s Statutes (McKinney’s Cons Laws of NY, Book 1, Statutes § 73). In section 73 it is cogently stated that courts should avoid judicial legislation; may not change or amend a statute, and should observe the judicial function to interpret, declare, and enforce the law. "A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisioned all of the problems and complications which might arise in the course of its administration; and no matter what disastrous consequences may result from following the expressed intent of the Legislature, the Judiciary cannot avoid its duty. Under the foregoing principle of judicial construction of statutes, courts may not * * * change the scope of a legislative enactment * * * [T]he courts are bound to assume that the Legislature acted with the best *268 motives and with the sole purpose of accomplishing what the statute purports” (McKinney’s Cons Laws of NY, Book 1, Statutes § 73). Stated in other terms, it is not the function of the judiciary to emasculate a statute.
Further "the intention is not lightly to be imputed to the Legislature of solemnly enacting a statute which is ineffective. Statutes are to be interpreted workably, and a statute must not be construed in such a way that would result in the Legislature having performed a useless or vain act” (McKinney’s Cons Laws of NY, Book 1, Statutes § 144). Courts are not to "impute to lawmakers a futile and frivolous intent * * * It is presumed that the Legislature intended statutes to have practical results, and they should be given practical construction or one that is practicable and not one that is unpracticable” (McKinney’s Cons Laws of NY, Book 1, Statutes § 141).
Domestic Relations Law § 117 should not be interpreted overbroadly as would interfere with the court’s ability to protect the best interests of the child. Although the statute makes specific reference to the natural and adoptive parents’ parental rights and duties, nothing in the statute purports to abrogate the interests of the child in continued family contacts (see, People ex rel. Sibley v Sheppard, 54 NY2d 320 [1981], supra). Section 117 has been part of this State’s law since 1938 (see, L 1938, ch 606). Social Services Law § 383-c became effective January 1, 1991. The Legislature is presumed to know what statutes are in effect when it enacts new laws (Easley v New York State Thruway Auth., 1 NY2d 374, 379). The Legislature must have been aware of section 117 when it enacted section 383-c of the Social Services Law and intended each to have full effect. What exactly does section 383-c accomplish regarding adoption of children? It expedites and facilitates the freeing of children in foster care for adoption by the expedient method of surrender on the part of the parent of the child. Aware that the adoption relieves the biological parent of the right to have contact with the child by virtue of the severing of the parent-child relationship in legal contemplation (see, Domestic Relations Law § 117), the Legislature determined to extend the concept of open adoption beyond the maintenance of continuing sibling relationships and grandparent-grandchild relationships to the maintenance of some form of continuing contact between the biological parent and the child. In other words, the Legislature in enacting section 383-c did not distort the plain intent of Domestic Relations Law § 117, but merely granted to the biological parent of a child in *269 foster care who determined to free the child for adoption, the privilege to have standing to petition the court for continuing contact with the child postadoption where such privilege was explicitly reserved in the surrender. The controlling mandate on the court is always the best interests of the child. Accordingly, the statute does not convey an automatic right to visitation, but simply permits the biological parent postadoption to petition the court and, where appropriate, for the court to conduct a best interests hearing. Essentially, section 383-c conveys standing on the biological parent similar to the standing afforded grandparents under Domestic Relations Law § 72 and afforded a sibling under Domestic Relations Law § 71.
By enacting Social Services Law § 383-c, the Legislature, insofar as foster care children are concerned, has grasped the invitation to authorize open adoption extended by the Court of Appeals in Matter of Gregory B. (74 NY2d 77, supra). The adoptive relationship, unknown to the common law, is strictly a creature of statute. As aptly stated in People ex rel. Sibley v Sheppard (supra, at 327-328): "Having created the adoptive relationship, the State should be allowed to determine to what extent the child’s contacts with its natural family will be ended. The adoptive family arises out of the State’s concern for the best interest of the child (see Domestic Relations Law, §§ 114, 116, subd 4). Completion of the adoption process does not oust the State of all power to continue its supervision of the child’s best interest”.
Of course, it has always been recognized that adoptive parents are free, at their election, to permit contacts between the adopted child and the child’s biological parent. The judicial recognition of the privilege to petition for such contact is now recognized under the circumstances outlined in Social Services Law § 383-c.
In view of the aforesaid, this court in these two proceedings advised the respective foster parent and biological parent that the reservation of the privilege to maintain visitation with the child embraced within the terms of the surrender instrument would be acceptable to the court as authorized by Social *270 Services Law § 383-c. However, the court also advised that such reservation does not convey an automatic right to visitation, but confers standing on the biological parent’s part to seek such visitation as in the child’s best interests.[5]

. While respondent is only the putative father of the child, the Law Guardian was fully supportive of the putative father’s continued relationship with the child, advising that "I brought her back to the family, she went immediately to her father, gave him a hug and a kiss and called him poppy. It’s obvious that her — that while regular contact seems to have been for a short period she has a good deal of affection for her father, and it seems consistent with the child’s best interest that the relationship continue.”

. An abuse of discretion so egregious as to present a question of law is clearly reviewable on appeal.

. Prior to the Court of Appeals’ holding and observations in Matter of Gregory B. (74 NY2d 77, 90-91 [1989]), there was case law indicative of judicial imprimatur of open adoption under appropriate circumstances (Matter of Elizabeth Q., 126 AD2d 905 [3d Dept 1987]; Matter of Dana Marie E., 128 Misc 2d 1018 [Fam Ct, Queens County 1985, Cognetta, J.]; Matter of Anthony, 113 Misc 2d 26 [Fam Ct, Bronx County 1982, Mainzer, J.]; cf., Matter of Jeanette H. v Angelo V., 148 Misc 2d 721 [Fam Ct, Suffolk County 1990, Abrams, J.]). The concept of open adoption occurred also in the context of sibling visitation (Matter of Patricia A. W., 89 Misc 2d 368 [Fam Ct, Kings County 1977, Gartenstein, J.]) and biological grandparent visitation (People ex rel. Sibley v Sheppard, 54 NY2d 320 [1981]).

. This court has also been advised that in some instances where a court has simply refused to accept the surrender for the sole reason that it .contains a reservation of right (as for example, the right to maintain visitation with the child), the reservation has been stricken from the surrender, but embraced in a separate written agreement between the natural parent and the prospective adoptive parent. This is mischievous.

. The reservation of the right to maintain contact with or learn about the child, whether in the context of visitation or otherwise, the surrender instrument is not a condition of the surrender. Advice was given that if the adoptive parent opposes the continuation of such contact postadoption, this would not affect the efficacy of the surrender, but that the reservation of such right in the surrender would afford the biological parent standing to seek such contact via judicial process. Note the surrender instrument itself upon judicial approval terminates parental rights and as such forms the basis for dispensing with the parental consent at the adoption.