OPINION OF THE COURT
Carmen J. Cognetta, Jr., J.
This is a termination of parental rights proceeding brought pursuant to Social Services Law § 384-b and Family Court Act article 6. The petition is brought against both natural parents *1019 Pearl E., the natural mother, and Stephen B., the putative father, by the Brooklyn Home for Children.
This petition was filed on March 31,1983. Service by publication was ordered by Judge Phoebe K. Greenbaum on the putative father on April 8,1983. Service by publication was made in the New York Amsterdam News on April 23, 1983. Mr. B. has never appeared and is in default. The mother, Pearl E., was personally served on April 19,1983 and subsequently appeared. This case was then transferred to New York County with appearances on May 24,1984. On September 13,1984, without any action being taken in New York County, this case was referred to Queens County. The respondent mother was hospitalized from October 1984 through December 1984 and the court was unable to proceed. On March 12, 1985 the hearing began and was continued on March 19, 1985 and completed on March 29, 1985. On April 25, the child was interviewed in chambers in the presence of the Law Guardian.
The petitioner argues that the parental rights of the putative father should be terminated pursuant to Social Services Law § 384-b (4) (b), (d) in that he has abandoned this child for six months immediately prior to the date the petition was filed and that the child is permanently neglected. It further asserts that the parental rights of the natural mother should be terminated pursuant to Social Services Law § 384-b (4) (c) in that she is presently and for the foreseeable future unable, by reason of mental illness, to provide proper and adequate care for the child.
The petitioner has proven by clear and convincing evidence that the putative father has never had any contact with the child or the agency since the child came into placement seven years ago. The putative father has abandoned this child as defined by the Social Services Law and therefore his parental rights are terminated and his consent for her adoption is dispensed with.
At the hearing regarding the natural mother, two experts testified: the court-appointed psychiatrist, Dr. Norman Kaplan, and the psychiatrist presently assigned to respondent at Creed-moor State Hospital, Dr. Thomas Rice. Both psychiatrists agreed that the respondent suffered from mental illness (paranoic schizophrenia) and that she would be unable to properly plan for and care for this child for the foreseeable future. In addition, the medical records of eight of respondent’s admissions to Creedmoor State Hospital were admitted in evidence. The records show various admissions to the hospital from 1981-1983 for stays of two weeks to three months. During the pendency of *1020 this action the respondent was hospitalized at Creedmoor for a period of three months. All the records include the same diagnosis and the prognosis upon discharge has been always stated as guarded. The reports also indicate that upon discharge respondent has consistently failed to take the prescribed medicine and that she possibly abuses drugs and alcohol. Dr. Rice stated that it would be “quite dreadful” if she was living with the child and she began to “decompensate” — that is, regress to a mental state requiring hospitalization. In addition, the caseworker testified that the agency has made diligent efforts to reunite the respondent and her child, including a trial discharge in 1981 which ended when the respondent mother requested that the agency take her daughter back. The petitioner has proven clearly and convincingly that the respondent mother is unable to provide proper and adequate care for this child due to mental illness and therefore her parental rights are terminated and her consent for adoption shall be dispensed with.
However, this case requires special consideration due to the fact that the respondent mother and daughter have a continuing, ongoing relationship. When the respondent is not hospitalized or decompensating she does visit her daughter. The child Dana is now 12 years old. She lived with her mother until she was five years old and has had a continuing relationship with her mother. To decide at this point that she can no longer see her mother or have any contact with her would prove most harmful to the child. At issue here is whether Dana’s needs for adequate care and a sense of stability in her life, which requires this court to terminate her mother’s parental rights, also bars Dana from ever seeing her mother again.
In deciding the “threshold question” of whether this mother’s parental rights should be terminated, this court did not include as a factor to consider in that determination the best interests of the child but rather only whether the parent has met the State-defined requisite for that termination. (Corey L v Martin L, 45 NY2d 383,391.) However, meeting the best interests of the child is a policy goal that requires this court to consider that issue in the circumstances presented here.
Traditionally, adoptions have been perceived as involving infants who have not had any contact with or do not possess any memories of their natural parents. With the advent of the termination of parental rights procedure, the interest of the Legislature in providing stability for those children in foster care as well as the increasing number of divorces and remarriages involving children, more children are being adopted at *1021 older ages who have had substantial contact with their natural parents and may well have lived with natural parents longer than they have lived with their adoptive parents. This development has given rise to consideration of the so-called “open adoption”.
Even as far back as 1917, the Second Department held that “[t]he Supreme Court has ample power at law and in equity to promote the welfare of the child, notwithstanding a legal adoption * * * [T]o permit and to regulate visitation on the part of the [natural] mother is, of course, included.” (Matter of McDevitt, 176 App Div 418, 423.)
More recently, several courts have recognized that even after adoption the welfare of the child is best served by continuing relations between the child and the natural family.
The Court of Appeals has ordered visitation for natural grandparents after an adoption (People ex rel. Sibley v Sheppard, 54 NY2d 320) and other courts have ordered continuing visitation after an adoption with siblings (Matter of Anthony, 113 Misc 2d 26); a natural father after a finding of his abandonment of a child (Matter of Raana Beth N., 78 Misc 2d 105); and with a divorced father, where the court found it could not interfere with his visitation rights granted in a divorce decree even after an adoption. (Matter of Widrick, 25 Misc 2d 1078.)
In the recent Court of Appeals case of Matter of Joyce T. (65 NY2d 39), a case with a very similar fact pattern and also controlled by Social Services Law § 384-b (4) (c), the court upheld the Family Court determination that the parents suffered from mental retardation and therefore parental rights should be terminated but specifically noted that it had not reached the question of whether after termination of parental rights, provision may be made for visitation with the biological family in an order of adoption, listing certain authority for that proposition {supra, p 46, n 2). The court also stated that although there is no requirement for a special dispositional hearing in cases involving mental retardation, it would not be error for a court, in its discretion, to order a dispositional hearing in such cases.
Two recent articles have explored the concept of open adoption, Open Adoption: Allowing Adopted Children to Stay in Touch With Blood Relative (Amadio and Deutsch, 22 J Fam L 59) and Use and Abuse of the Power to Sever Family Bonds (Davis, 12 NYU Rev L & Soc Change 557). Both articles concluded that in certain circumstances continued contact with a natural parent after adoption will only help the child to become *1022 better adjusted emotionally. Former Family Court Judge Peggy C. Davis states in her article {id., p 572) that “[W]e must encourage, rather than prohibit, visitation and other forms of communication with adults who are important to the child, whether they be biological parents unable for long periods to assume custody or former foster parents.”
It is conceded that in most cases visitation with natural parents would be inappropriate. However, in some select cases, especially where the child or children are teen-agers or near teens, have lived with and know the parent, had consistent contact with the parent and wish to continue to see the parent, it would be in the best interest of such children to order visitation with an adoption.
In this case Dana, almost 13 years old, has had substantial contact with her mother. She lived with her mother for the first five years of her life and during a trial discharge as recently as 1981 and she has expressed an interest in continuing to see her mother. Dana fully understands that her mother will probably never be able to properly care for her due to mental illness but she does not want her to disappear completely from her life. She is presently living in a foster home where the foster mother has agreed to adopt her if she becomes free for adoption.
Therefore, it shall be the order of this court that the parental rights of the putative father of Dana E., Stephen B., are terminated due to abandonment and permanent neglect pursuant to Social Services Law § 384-b (4) (b), (d), the parental rights of the natural mother of Dana E., Pearl E., are terminated pursuant to Social Services Law § 384-b (4) (c) and that their consent to the adoption of Dana E. is dispensed with. Further, any order of adoption shall contain a provision for the continued visitation between the natural mother and Dana.
The guardianship and custody of Dana E. is committed to the Commissioner of Social Services and the Brooklyn Home for Children.