KELLY, Judge:
 

 In this opinion, we are called upon to determine whether the trial court may compel parents to produce their minor daughter for visitation with their child’s minor sibling who has been adjudicated a dependent child, pursuant to 42 Pa.C.S.A. § 6301
 
 et seq.,
 
 in the absence of a showing by the minor sibling that visitation would be in the best interests and permanent welfare of their minor daughter. The appellant,
 
 *85
 
 C.F., appeals from the order of September 15,1993 entered in the Court of Common Pleas of York County, Juvenile Division, which denied the petition filed on behalf of the appellant requesting supervised visitation with his sister, R.F. We conclude that no statutory basis exists in Pennsylvania which would mandate the interference of the court with the parents’ right to undisturbed custody of their daughter or would require the parents to produce their daughter for visitation with their child’s minor sibling. Accordingly, we affirm the order which denied the petition filed on behalf of the appellant requesting supervised visitation with his sister.
 

 The relevant facts and procedural background are as follows. C.F., born January 26, 1981, and R.F., natural brother and sister, were adopted by Mr. and Mrs. F. in 1983. Following an incident where C.F. allegedly threatened R.F. with a knife, Mr. and Mrs. F. abandoned C.F. at Allentown State Hospital on November 29,1990. On December 4,1991, following a dependency hearing, Judge Sheryl Ann Dorney found that the parties had reached an agreement which called for adjudication of C.F. as a dependent child. Judge Dorney determined that further evaluations of C.F. were necessary, prior to C.F.’s prospective discharge from Allentown State Hospital and placement in another home through the Host Home program. Judge Dorney adjudicated C.F. a dependent child pursuant to 42 Pa.C.S.A. § 6301
 
 et seq.,
 
 and directed that temporary legal and physical custody of C.F. be awarded to York County Children and Youth Services.
 
 [1]
 

 Disposition pursuant to 42 Pa.C.S.A. § 6351 was continued to March 9, 1992, at which time Judge Penny L. Blackwell determined that the goal with respect to disposition of C.F. was to be changed from one of returning home to that of long-term placement. Judge Blackwell directed that C.F. be removed from Allentown State Hospital to a Host Home within the West York area, a move necessitated by the fact that Allentown State Hospital was closing its doors permanently. In addition, Judge Blackwell ordered York County Children
 
 *86
 
 and Youth Services and the Host Home program to place Mr. and Mrs. F. on their list of individuals to be contacted if C.F. should be absent from the placement home for a period of one hour, especially if C.F.’s whereabouts were unknown. Judge Blackwell also directed that C.F. be forbidden entry into the Eastern School District, where his sister was attending school, absent an agreement of all of the parties involved in the case or without prior approval of the court; C.F. might travel through the school district but he was forbidden to enter or have any contact with the Eastern school system. Moreover, if the adoptive parents, Mr. and Mrs. F., moved outside the Eastern School District, they were directed to notify York County Children and Youth Services and the Host Home program so that the order could be amended to reflect the school system to which they moved. Judge Blackwell ordered that C.F. be placed in a “specialized foster care home” (N.T. March 9, 1992 at 2) through the Host Home program, and formally awarded legal and physical custody of C.F. to York County Children and Youth Services.
 

 On May 27, 1992, a review hearing was held before a Juvenile Master, Jeffrey T. Bitzer, Esquire. Although Mr. and Mrs. F. were notified of the proceeding, they did not attend nor did their attorney, who had recently been the victim of an auto/pedestrian accident. The Master found that C.F., having been discharged from Allentown State Hospital into the Host Home program thence to the foster home of Mr. and Mrs. G., was making “good and steady adjustment.”
 
 [2]
 
 The Master recommended that the travel restrictions contained in the March 9, 1992 order be lifted and that C.F. be permitted to travel to locations within the Eastern School
 
 *87
 
 District. However, the Master also recommended that the prohibition on contact between C.F. and Mr. and Mrs. F. be continued. The Master declared the continuing goal to be long-term foster care. Judge Blackwell approved the findings and recommendations of the Master and confirmed them as the order of the trial court.
 

 On November 17, 1992, another review hearing was held before the same Juvenile Master, Jeffrey T. Bitzer, Esquire. The Master found that C.F. continued to reside with Mr. and Mrs. G., his foster parents, where C.F. was “making slow but steady progress, and learning to control his negative behaviors .... Although he no longer displays physical aggression, that he still can become defiant to authority figures.”
 
 [3]
 
 The Master recalled that at the last review hearing, the travel restrictions had been lifted and that the adoptive parents had not taken issue with that recommendation through a petition for modification. The Master noted also that neither the adoptive parents nor their attorney were in attendance at the May 27, 1992 hearing or at the present hearing. The Master then approved the recommendations, submitted by both York County Children and Youth Services and C.F.’s social worker, that C.F. have contact with his biological sister, R.F., citing C.F.’s sense of loss and separation caused by the prohibition against any contact between the siblings. The Master noted that Mr. and Mrs. F. had not taken issue with his recommendation of the May 27, 1992 hearing that C.F. be permitted to travel through and to a location in the Eastern School District by filing a petition for modification. He further noted that if Mr. and Mrs. F. had any objection to contact between C.F. and R.F., they should contact York County Children and
 
 *88
 
 Youth Services within fourteen days of the hearing. Apparently, C.F. had also expressed an interest in arranged visitation with his maternal adoptive grandmother and the Master conjectured that perhaps the grandmother might prove to be an appropriate resource to either supervise or provide a setting for visitation between C.F. and R.F. Once again, Judge Blackwell confirmed the findings and recommendations of the Master as the findings and order of the court.
 

 On April 27, 1993, another review hearing was scheduled to have taken place before Jeffrey T. Bitzer, Esquire, but was rescheduled for a later date. On May 10, 1993, Judge Blackwell presided over a judicial review of the request by York County Children and Youth Services that C.F. be permitted contact with his biological sister, R.F. Judge Blackwell found that, based upon the indications in an April 29, 1993 letter addressed to the trial court from a York County Children and Youth Services caseworker and her supervisor, C.F.’s “placement continues to be necessary and appropriate.” The letter also included the following information:
 

 [C.F.] continues to reside in the foster home of A.G. and L.G., where he is well-cared-for and thriving____ However, his negative behaviors continue to be of much concern....
 

 [C.F.] still has difficulty taking directions from persons in authority, especially females, and he is not always truthful when confronted about his wrong doings....
 

 [C.F.] is still in the sixth grade SED at Spring Grove Intermediate School. His teacher reports that he is capable academically but is becoming increasingly more defiant in the classroom, refusing to do his work. On March 23rd, he was suspended from school for threatening to kill his teacher and break her nose. [C.F.] has been caught stealing candy from the teacher’s desk. On March 25th, [C.F.j’s behavior became out of control and violent to the point where he had to be physically restrained. [C.F.] was kicking, punching others, and said he was going to bring a knife to school. Crisis Intervention was called and [C.F.] was subsequently admitted to the Meadowlands of York Hospital for a psychiatric. evaluation.
 

 
 *89
 
 [C.F.] remained in the hospital for seven days. During that time, it was reported by staff that he became the “model patient.” It was felt that he used his reported negative behaviors as a means for seeking attention.... Of significant note though, [C.F.] has been referred to Dr. Bryan Stevens, a psychiatrist, to evaluate for possibility of schizophrenia or manic-depression....
 

 The adoptive parents remain uninvolved. [C.F.] still grieves over the abandonment and has a difficult time understanding their position. [C.F.] still desires to see his biological sister. The maternal adoptive grandmother was contacted in January of 1993 regarding visitation, but said, “Because of the particular situation, there is no way I can deal with [C.F.] at this time.”
 

 At the last Judicial Review a recommendation was made that the agency arrange for contact between [C.F.] and his sister at the earliest possible date.... [S]ince that time, a letter was forwarded to you objecting to this matter on the grounds that visits between the siblings could prove detrimental to the sister’s mental well-being.
 

 The agency is once again requesting that supervised visitation be allowed....
 

 (Letter from York County Children and Youth Services to Judge Blackwell, dated April 29, 1993). Judge Blackwell then continued the hearing, due to the absence of C.F.’s attorney, and ordered that all parties submit briefs on the matter of visitation between C.F. and R.F.
 
 [4]
 
 On September 16, 1993, by opinion and order, the trial court, finding that Mr. and Mrs. F. were vehemently opposed to the occurrence of supervised visitation between C.F. and R.F. and that it had no jurisdiction to interfere where “[tjhere has been no allegation or adjudication of dependency concerning R.F.” (Trial Court Opinion, dated September 16, 1993 at 3), denied the appellant’s request for supervised visits with his sister. This timely appeal followed.
 

 The sole question which the appellant raises on appeal is:
 
 *90
 
 WHETHER ADOPTIVE PARENTS WHO ABANDON THEIR CHILD, CAUSING HIM TO BECOME DEPENDENT, MAY BE COMPELLED TO PRODUCE THE CHILD’S NATURAL SIBLING, WHO IS STILL IN THEIR CUSTODY FOR VISITATION?
 

 Appellant’s Brief at 3.
 

 Whether the matter concerns custody or visitation, the ultimate consideration of the court is a determination of what is in the best interests and permanent welfare of the child.
 
 Wiskoski v. Wiskoski, 427
 
 Pa.Super. 531, 534-35, 629 A.2d 996, 998 (1993),
 
 appeal denied,
 
 536 Pa. 646, 639 A.2d 33 (1994);
 
 Bucci v. Bucci
 
 351 Pa.Super. 457, 460, 506 A.2d 438, 439 (1986).
 
 See Nonnenman v. Elshimy,
 
 419 Pa.Super. 597, 615 A.2d 799 (1992),
 
 appeal denied,
 
 535 Pa. 637, 631 A.2d 1008 (1993) (“In custody and visitation cases, the paramount concern is the best interests of the child.”). This determination is made on a case-by-case basis and must be premised upon a weighing of “all factors which legitimately have an effect upon the child’s physical, intellectual, moral and spiritual well-being.”
 
 Wiskoski v. Wiskoski supra
 
 (quoting
 
 Lee v. Fontine,
 
 406 Pa.Super. 487, 488, 594 A.2d 724, 725 (1991), citing
 
 Zummo v. Zummo,
 
 394 Pa.Super. 30, 574 A.2d 1130 (1990)).
 

 When reviewing visitation orders, appellate courts are not bound by the trial court’s deductions, inferences and interpretations of evidence.
 
 Bucci v. Bucci, supra
 
 at 460, 506 A.2d at 440.
 
 See also McMillen v. McMillen,
 
 529 Pa. 198, 602 A.2d 845 (1992) (when reviewing child custody orders, appellate court is empowered to determine whether the trial court’s incontrovertible factual findings support its factual conclusions, but it may not interfere with trial court’s conclusions unless they are unreasonable in view of trial court’s factual findings, thus representing gross abuse of discretion). Despite our broad scope of review, we are mindful that matters of credibility are solely within the trial court’s discretion; only the trial judge can observe demeanor and assess trustworthi
 
 *91
 
 ness.
 
 Bucci v. Bucci, supra
 
 at 461, 506 A.2d at 440.
 
 See generally Altus-Baumhor v. Baumhor,
 
 407 Pa.Super. 276, 278, 595 A.2d 1147, 1148 (1991) (quoting Mumma
 
 v. Mumma,
 
 380 Pa.Super. 18, 21, 550 A.2d 1341, 1343 (1988)).
 

 In addition, we are mindful that, as this Court stated in
 
 Weber v. Weber,
 
 362 Pa.Super. 262, 524 A.2d 498 (1987),
 
 appeal dismissed,
 
 517 Pa. 458, 538 A.2d 494 (1988):
 

 The right to raise one’s children has long been recognized as one of our basic civil rights.
 
 Pierce v. Society of Sisters,
 
 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925);
 
 Meyer v. Nebraska,
 
 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923);
 
 In Re Rinker,
 
 180 Pa.Super. 143, 117 A.2d 780 (1955). Freedom of personal choice in matters of family life, and the concomitant freedom from unwarranted governmental intrusion, is a fundamental liberty interest protected by the Fourteenth Amendment.
 
 Santosky v. Kramer,
 
 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). For these reasons, governmental intrusion into the family is warranted only in exceptional circumstances. The statutory basis for court interference with the parents’ right to custody are limited and specific, reflecting that philosophy. See, 11 P.S. § 2208 (taking an abused child into protective custody); 23 Pa.C.S. § 5311-5313 (grandparents visitation); 42 Pa.C.S. § 6351, 6352 (disposition of dependent and delinquent children).
 

 Id.
 Id. 362
 
 Pa.Super. at 264, 524 A.2d at 499.
 

 In
 
 Weber v. Weber, supra,
 
 this Court was faced with a situation which was factually somewhat similar to the instant matter. In that case, the parents of an adult daughter would not permit their minor daughter to visit with the adult daughter in her residence or at places outside the parents’ home, because the parents did not approve of their adult daughter’s living arrangements.
 
 [5]
 
 The adult daughter filed a complaint
 
 *92
 
 seeking partial custody of her sister. The parents filed a motion for summary judgment, asserting that the adult daughter had not stated a cause of action. The trial court granted, the motion, dismissing the adult daughter’s complaint. An appeal followed.
 

 On appeal, this Court agreed with the trial court that the adult daughter did not have standing to bring an action for partial custody of a minor child over the objections of the minor child’s parents. The Court reasoned that the issue was not simply whether the sisters should be permitted to visit with one another, but rather encompassed the broader question of whether and to what extent the courts may interfere in a decision made by the parents of a minor child, concerning with whom that child may associate. The Court acknowledged that, given the specific facts of the case, there was no statutory basis for court interference with the parents’ right to custody. Thus, this Court concluded that it would not “intervene in this family matter in which no legal rights are at issue.”
 
 Id.
 
 at 265, 524 A.2d at 499 (quoting
 
 Herron v. Seizak,
 
 321 Pa.Super. 466, 470, 468 A.2d 803, 805 (1983)). The Superi- or Court affirmed the trial court’s order granting summary judgment to the parents and dismissing the adult daughter’s petition.
 

 Instantly, after extensive research, we conclude that no statutory basis exists in Pennsylvania which would mandate court interference with Mr. and Mrs. F.’s right to undisturbed custody of their daughter, R.F., or would require Mr. and Mrs. F. to produce their daughter for visitation with their child’s minor sibling.
 
 See
 
 23 Pa.C.S.A. § 5301
 
 et seq.
 
 In addition, the appellant offered no showing that visitation with his sister would be in the best interests and permanent welfare of R.F.
 
 See Wiskoski v. Wiskoski, supra; Bucci v. Bucci, supra. See also Norris v. Tearney,
 
 422 Pa.Super. 246, 619 A.2d 339 (1993) (in grandparent visitation case, grandparent has burden to prove that visitation is in best interests of child);
 
 Nonnenman v. Elshimy, supra
 
 (rights of guardian of
 
 *93
 
 incompetent adult existed solely for ward’s benefit and were subordinate to best interest of ward’s child with respect to child’s visitation with ward);
 
 Commonwealth ex rel. Zaffarano v. Genaro,
 
 286 Pa.Super. 436, 429 A.2d 17 (1981),
 
 rev. on other grounds,
 
 500 Pa. 256, 455 A.2d 1180 (1983) (although true that third parties in general have no inherent legal right of either visitation or partial custody of a child, test to be applied in situation in which third party seeks visitation or partial custody is whether it is in the child’s best interest to give some time to third party);
 
 Commonwealth ex rel. Williams v. Miller,
 
 254 Pa.Super. 227, 385 A.2d 992 (1977) (when seeking visitation, third party must show reasons to overcome parent’s
 
 prima facie
 
 right to uninterrupted custody; reasons need not be so convincing as in a custody case; in visitation case, third party need only convince court that it is in the child’s best interest to give some time to third party). Moreover, pursuant to our holding in
 
 Weber v. Weber, supra,
 
 we refuse to “intervene in this family matter in which no legal rights are at issue.”
 
 Id.
 
 362 Pa.Super. at 265, 524 A.2d at 499. Based on the foregoing, we affirm the order which denied the petition filed on behalf of the appellant, requesting supervised visitation with his sister.
 

 Order affirmed.
 

 [1]
 

 . Counsel for Mr. and Mrs. F. attended the hearing, but Mr. and Mrs. F. were not present.
 

 [2]
 

 . Other findings of the Master included: The G.s, C.F.’s foster parents, reported no particular psychotic episodes.' C.F. was continuing to address his problems with profanity. He was described by his fifth grade teacher as "on target except in the area of math,” and reportedly had good peer relations in the classroom. C.F. was participating in therapy with social worker Thomas Murray twice per month, where he addressed issues of allowing others personal space, social skills, and handling his anger. C.F. was also exploring issues surrounding his rejection by his adoptive parents. C.F. was participating in weekly therapy to address speech issues, specifically, stuttering. His medication had been continued but recently was reduced in dosage.
 

 [3]
 

 . The Master also found the following: C.F. was enrolled in a special program at Spring Grove Intermediate School, where he was classified as a sixth grade student. He was continuing his twice monthly therapy with social worker Thomas Murray where he was addressing separation issues, relationships with females, and issues of self-esteem. However, C.F.’s foster parents and his caseworker reported that C.F. had begun to tell lies on a daily basis. Thomas Murray, C.F.’s social worker, described C.F.’s adjustment to the foster home as moderately positive and confirmed that the problem of C.F.’s lying was being addressed in therapy sessions.
 

 [4]
 

 . Mr. and Mrs. F. were present, along with their attorney.
 

 [5]
 

 . She was unmarried and resided with an unmarried man in a residence separate from her parents and her sister.