IN RE INTEREST OF DANIEL.W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. KEN W. AND DIANE W.,
APPELLANTS.

529 N.W.2d 548

Filed April 4, 1995.   No. A-94-642.

James Martin Davis for appellants.

Michael L. Munch, Sarpy County Attorney, and Mary Margaret Zerse Stevens for appellee.

IRWIN and MILLER-LERMAN, Judges, and MORAN, District Judge, Retired.

MILLER-LERMAN, Judge.

Ken W. and Diane W. appeal the June 10, 1994, decision of the separate juvenile court of Sarpy County, Nebraska, ordering sibling visitation between their 2-year-old daughter, Megan W., and their 16-year-old son, Daniel W., for 1 hour per month. The order of visitation arose after the court adjudged Daniel to be a juvenile under Neb. Rev. Stat. § 43-247(3)(b) (Reissue 1993). Following our review for plain error, we affirm.

## FACTS

On April 1, 1992, Diane W. placed her son, Daniel W., in the custody of the Sarpy County sheriff's Children at Risk Education (C.A.R.E.) program because of his allegedly uncontrollable behavior. In order to detain Daniel, juvenile probation officer William Marang completed a detention authorization worksheet which stated his findings that (1) Daniel's behavior was uncontrollable and (2) Daniel's further detention was necessary for the protection of Daniel and others.

A petition was filed on April 2, alleging that Daniel was a child within the meaning of § 43-247(3)(b) who deported himself in a manner which could seriously injure the health or morals of himself or others. The separate juvenile court of Sarpy County held a hearing on the matter on April 2 and found that Daniel's further detention was necessary. As a result, the court placed Daniel in the temporary custody of the Nebraska Department of Social Services (DSS).

The court held an arraignment on the matter on April 22. At the arraignment, Daniel admitted the allegations of the petition. Relying on Marang's detention authorization worksheet as a factual basis and Daniel's admission of the allegations, Judge William D. Staley adjudged Daniel to be a child as described in § 43-247(3)(b). Judge Staley then placed Daniel in the custody of the Sarpy County sheriff pending

further disposition.

On May 22, a disposition hearing was held before Judge Staley. Present at this hearing were Daniel and his attorney appointed as guardian ad litem, Diane and Ken, and Daniel's 5½-month-old sister, Megan W. During this hearing, Daniel told the judge he liked his sister. Judge Staley ordered that the application for Daniel's placement at Boys Town proceed. Judge Staley also ordered Daniel to reside at home with his parents while his application for Boys Town was pending and directed the parents to participate in a parenting program.

On May 27, Daniel was returned to the custody of the Sarpy County sheriff's office as a result of further allegations of uncontrollable behavior. Consequently, the Sarpy County Attorney's office filed a motion for review of disposition. This motion was sustained on July 9, and the court ordered Daniel to remain in the custody of the Sarpy County sheriff. On September 8, Judge Ronald E. Reagan amended the April 22 order and placed Daniel in the custody of DSS.

On September 10, Daniel's application was approved, and he was placed at Boys Town. Daniel resided at Boys Town until August 11, 1993, when he left to live with his paternal grandmother, Agnes R.

On June 16, 1993, a disposition hearing was held in front of Judge Lawrence D. Gendler of the separate juvenile court of Sarpy County. Daniel and his father appeared with counsel. Lori Rall, Daniel's case manager from DSS, and Yvonne Promes from Boys Town both testified at the hearing in regard to Daniel's progress at Boys Town. Rall also testified that the parents had taken an inactive role and had rarely visited Daniel during his stay at Boys Town. Judge Gendler's journal entry for this hearing reflects that the parents "refused to become involved with the said minor and have stated they do not want to be part of the reunification process."

The court held another disposition hearing on December 16, 1993. At this time, Daniel was living with his grandmother. The record suggests animosity exists between the grandmother and the parents. The court received into evidence a report from Daniel's therapist, Daniel Dwyer, which was also signed by Thomas Jaeger, M.D., child and adolescent psychiatrist, and

the DSS case report. At the hearing, Rall again stated that Daniel continued to progress, but was in need of contact with his family. Judge Gendler's journal entry from the hearing provides in pertinent part:

> [Dwyer's report] reflects the minor desires to have a relationship with his father and would like his father to be included in his therapy. The reports also reflect that the parents do not want anything to do with their son and do not want to participate in any therapy with him. In addition, the minor requested that visitation be considered between himself and his two year old sister.

At the December 16 hearing, Daniel's guardian ad litem moved the court to grant supervised sibling visitations between Daniel and his sister, Megan, who was then 2 years old. The court advised the parents that a ruling on the motion would be postponed to permit the parents to consult with their counsel and to permit them an opportunity to respond.

The court took up the issue, inter alia, of visitation between Daniel and his sister, Megan, on February 3, 1994. On February 3, the court received into evidence another report from Dwyer, also signed by Dr. Jaeger, which indicated that Daniel was having a great deal of difficulty dealing with the loss of his parents and the lack of contact with his sister. A report prepared by Rall generally to the same effect was also received in evidence. In connection with argument on the sibling visitation motion, the guardian ad litem for Daniel stated:

> This is a case of a young man who has had some problems, who has been — has come under the jurisdiction of the court as a result of some of those problems, and who desperately wants to have a relationship with his mom and dad, who cries out for that relationship on a regular basis in therapy, who talks about it on a regular basis to me when we've had our discussions, who doesn't necessarily expect that he'll ever get to live back home again, but all he wants to do is have a relationship with his mom and dad.
>
> It's a situation that is heartbreaking because there have been times in which we've stood out in the hallway and had one parent or another walk right by this young man

with not even so much as a glance, and it's one that hurts him very deeply and one that he continues to battle in therapy in dealing with trying to understand how he has gotten and how the family has gotten to the place in which they now are.

. . . .

Dan hasn't made a choice of his grandmother over his mom and dad. He has merely responded to the people who have expressed some attention and love for him in the last two years. What he wants to do is be able to respond to some attention and love from — and caring from his parents in the same way that he has been able to do that with the family members who have reached out to him.

. . . .

As for the visitation with Megan, Dan, of course, would like to see his little sister and it hurts him deeply that he hasn't been able to . . . .

At the February 3 hearing, the parents iterated that they wanted no contact with Daniel, especially when he was living with his grandmother. The parents also expressed their concern that sibling visitation between Daniel and Megan would cause problems in their home. The parents did not offer evidence in support of their position.

After reviewing the evidence, Judge Gendler ordered 1 hour of supervised sibling visitation per month between Daniel and Megan. Judge Gendler determined that Daniel's therapist, Dwyer, would act as supervisor for purposes of the visitation.

On June 9, the court held a visitation review hearing. At that time, no supervised monthly visits had occurred between Daniel and Megan. During the hearing, Judge Gendler admitted the most recent DSS case report into evidence and took judicial notice of his docket entry relating to the February 3 hearing and the exhibits which were received on February 3. Judge Gendler's comments at the June 9 hearing indicated that he did not think a contempt citation would be unreasonable if the parents did not make an effort to comply with the sibling visitation order. Specifically, Judge Gendler stated to the father: "It's time you put forth some effort. This boy deserves it." Accordingly, in his findings and order dated June 10, 1994,

Judge Gendler directed the parents to make Megan available for visitation with Daniel for 1 hour per month, supervised by Dwyer, upon 48 hours' notice by DSS. The parents appeal the June 10 findings and order.

## APPELLATE JURISDICTION

■ Before addressing the merits of this case, we must determine whether this court has jurisdiction to hear this appeal. See *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992) (holding that an appellate court has both the power and the duty to determine whether it has jurisdiction over the matter before it).

■ Pursuant to Neb. Rev. Stat. § 43-2,126 (Reissue 1993), "[a]ny final order or judgment entered by a separate juvenile court may be appealed to the Court of Appeals." There are three types of final and appealable orders under Neb. Rev. Stat. § 25-1902 (Reissue 1989): (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after judgment is rendered. *Jarrett v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993).

■ The Nebraska Supreme Court has held that litigation under the juvenile code which involves the determination of whether a child is within. the purview of § 43-247(3)(a) is a special proceeding. *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991). Based on the reasoning of *In re Interest of R.G.*, we hold that litigation involving a child's status under § 43-247(3)(b) constitutes a special proceeding.

■ In regard to the issue of whether special proceedings involving juvenile matters affect substantial rights, the Nebraska Supreme Court stated in *In re Interest of R.G., supra*, that

the question of whether a substantial right of a parent has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the parent's relationship with the juvenile may reasonably be expected to be disturbed.

*Id.* at 415, 470 N.W.2d at 788.

In *In re Interest of Zachary W. & Alyssa W.*, 3 Neb. App. 274, 526 N.W.2d 233 (1994), this court determined that an order granting a grandparent's motion for visitation of children involved in juvenile proceedings affected a substantial right of the parent because it placed no limits on the visitation and allowed the visitation to be determined by DSS. Applying our analysis in *In re Interest of Zachary W. & Alyssa W.* to the facts of this case, we conclude that the order of visitation in the instant case is of sufficient importance and can reasonably be expected to last a sufficient period of time to affect a substantial right of the parents. Accordingly, the order of visitation is appealable.

## STANDARD OF REVIEW

Ordinarily this court reviews juvenile cases de novo on the record and is required to reach a conclusion independent of the trial court's findings; however, when the evidence is in conflict, an appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of J. T.B. and H.J. T.*, 245 Neb. 624, 514 N.W.2d 635 (1994). In the instant case, however, the parents' brief contains no assignments of error, and although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, an appellate court may, at its option, notice plain error. See *Dike v. Dike*, 245 Neb. 231, 512 N.W.2d 363 (1994). The term "plain error" refers to "error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process." *Id.* at 233, 512 N.W.2d at 365.

## ANALYSIS

*Sibling Visitation Order.*

The parents argue that the separate juvenile court of Sarpy County erred in ordering sibling visitation between Daniel and Megan because the court did not have jurisdiction over the parents or, alternatively, authority over Megan.

Section 43-247 of the Nebraska Juvenile Code grants the juvenile court of each county jurisdiction over the following:

(3) Any juvenile . . . (b) who, by reason of being wayward or habitually disobedient, is uncontrolled by his or her parent, guardian, or custodian; who deports himself or herself so as to injure or endanger seriously the morals or health of himself, herself, or others; or who is habitually truant from home or school; [and]

. . . .

(5) The parent, guardian, or custodian who has custody of any juvenile described in this section.

On April 22, 1992, Daniel was adjudged to be a child within the meaning of § 43-247(3)(b). The juvenile court acquired jurisdiction over Daniel under § 43-247(3)(b). Because of the adjudication of Daniel's status under § 43-247(3)(b), the juvenile court additionally gained jurisdiction over Daniel's parent, guardian, or custodian pursuant to subsection (5) of § 43-247.

We note that the language of § 43-247(5) grants the juvenile court jurisdiction over the parent or legal guardian "who has custody of" the juvenile in question. The term "custody" as used in § 43-247(5) is not defined in § 43-247 or elsewhere in the juvenile code. The cases show that in the context of minor children, the term "custody" may be used to characterize both the legal and physical responsibility for a child. The cases illustrate that it is common during the pendency of juvenile proceedings for legal custody to be separate from physical custody of a child. See, e.g., *State ex rel. Reitz v. Ringer*, 244 Neb. 976, 510 N.W.2d 294 (1994). For purposes of subsection (5) of § 43-247, we interpret the term "custody" to include reference to parents who have legal custody of the child. This interpretation is in accord with recent Nebraska Supreme Court cases which have allowed juvenile courts to issue orders prescribing treatment for, or prohibiting certain actions of, parents of § 43-247(3)(a) children where the parents had legal but not physical custody of such children. See, *In re Interest of J.T.B. and H.J.T., supra* (ordering the mother to obtain a chemical dependency evaluation and to enter a treatment program if recommended by the evaluator); *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991) (directing the mother to live without roommates, unless approved by DSS;

find employment and housing; and participate in an inpatient treatment program for drug and alcohol abuse).

The foregoing analysis of subsection (5) as including jurisdiction over the legal custodians of juveniles is consistent with the Practice Note for § 43-247, which ignores the statutory "custody" language of subsection (5), and states:

> (1) The juvenile court has exclusive original jurisdiction of . . . (b) juveniles who are under age 18 and are alleged to be neglected or dependent or in need of special supervision (43-247(3)(a) and (b)); [and] (c) the parents, guardians, or custodians of any juvenile coming under provisions of section 43-247 . . . .

Accordingly, we find that the juvenile court has jurisdiction over the parents.

The parents argue that, even if the juvenile court has jurisdiction over them, it does not have "jurisdiction" over their daughter, Megan. The parents argue that there have been no allegations that Daniel's sibling, Megan, is a juvenile within the meaning of § 43-247 and argue that none of the subsections of § 43-247 directly confer jurisdiction in the juvenile court over siblings of a subject juvenile.

Although we agree with the parents that the juvenile court has no direct statutory jurisdictional authority over Megan, we believe that given the juvenile court's jurisdiction over the parents and the court's broad powers to fashion appropriate placement and plans in the best interests of its subject juveniles such as Daniel, the juvenile court did not commit plain error in this case when it directed the parents to make Megan available for visitation with her sibling for 1 hour per month. See Neb. Rev. Stat. § 43-246(4) (Reissue 1993) (providing that the juvenile code shall be construed in a manner "to assure every reasonable effort possible to reunite the juvenile and his or her family").

The parents argue that the absence of statutory authority providing for sibling visitation precludes the visitation order issued in this case. They note that grandparents' visitation rights in Nebraska are statutorily created by Neb. Rev. Stat. § 43-1802 (Reissue 1993) and suggest that similar legislation is required before sibling visitation is properly ordered.

Prior to the enactment of the grandparent visitation statute in 1986, the Nebraska Supreme Court held in *In re Interest of Ditter*, 212 Neb. 855, 326 N.W.2d 675 (1982), that where the natural parents' rights had been terminated, the grandparents were not entitled to grandchild visitation. The logic applied in *In re Interest of Ditter* was that grandparents' visitation rights were derived through the natural parents of the children in question, and where the natural parents' parental rights were terminated, the rights of the grandparents were also extinguished. Subsequent legislation thus provided the basis for grandparents seeking visitation following termination and under other scenarios, such as divorce.

■ In contrast to the case law finding the nature of grandparent visitation to be derivative, it has been held that "siblings possess the natural, inherent and inalienable right to visit with each other." *L. v. G.*, 203 N.J. Super. 385, 398, 497 A.2d 215, 222 (1985). Thus, even in the absence of legislation providing therefor, sibling visitation has been ordered where the best interests of the subject juvenile were demonstrated. *Id.*

■ It has been said that "the relationship between a child and his/her siblings is a significant and unique one, from which a myriad of benefits and experiences may be derived. The bonds which develop between brothers and sisters are strong ones, and are, in most cases, irreplaceable." *Id.* at 398, 497 A.2d at 222. Indeed, it has also been stated that

[a] sibling relationship can be an independent emotionally supportive factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s) which truly cannot be derived from any other. . . . Surely, the right to visit with one's own brother or sister is equal to, if not greater than the right to visit with one's grandchildren. . . . The fact that custodial parents may not desire visitation between their children and the children's sibling can never, in and of itself, be a sufficient reason for denying that visitation. Rather, this Court finds that its inquiry must focus upon whether the child's best interests will be served by maintaining contact and communication with their [sic] siblings.

*Id.* at 395, 497 A.2d at 220-21.

The foregoing statement of the need for sibling association is consistent with the cases emphasizing continued sibling association after divorce and the continued visitation among siblings placed in separate foster homes. See, e.g., *Roberts v. Roberts*, 668 S.W.2d 249 (Mo. App. 1984) (divorce); *Matter of Adoption of Anthony*, 113 Misc. 2d 26, 448 N.Y.S.2d 377 (1982) (foster homes). It has also been observed that statutes granting visitation rights to family members are intended to supplement the common-law rights of those entitled to visitation. See, e.g., *In re Custody of D.M.M.*, 137 Wis. 2d 375, 404 N.W.2d 530 (1987). See, also, *L. v. G., supra* (collection of cases and state statutes granting visitation rights to family members).

We are aware of cases where sibling visitation has been denied by the court due to a lack of showing of the best interests of the nonadjudicated juvenile. See, e.g., *In Interest of C.F.*, 436 Pa. Super. 83, 647 A.2d 253 (1994). In the instant case, the parents presented no evidence that visitation between Daniel and Megan would be harmful to Megan. We distinguish *In Interest of C.F.* on its facts. In that case, the two siblings in question had been adopted by the same family. The opinion in *In Interest of C.F.* states that the boy threatened his sister with a knife, and thereafter, the adoptive parents abandoned the boy, who became a ward of the state. After 3 years in the custody of the York County (Pennsylvania) Children and Youth Services, the brother was still troubled, threatened to kill his teachers, and was committed for psychiatric evaluation. During this time, the York County Children and Youth Services, on behalf of the brother, moved the court to grant sibling visitation between the brother and the sister. The adoptive parents opposed visitation between the siblings. The court denied visitation for lack of statutory authority and a failure to demonstrate best interests.

In contrast to *In Interest of C.F.*, in the instant case, Daniel and Megan are part of a legally intact family, and the parents are the legal custodians and natural parents of both children. Further, in the instant case, Daniel and the parents are statutorily within the jurisdiction of the juvenile court.

Although the brother in *In Interest of C.F.* was adjudicated to be within the jurisdiction of the juvenile court, the facts in *In Interest of C.F.* show that the adoptive parents had relinquished legal and physical custody of him and did not regularly appear at his disposition hearings. The facts in *In Interest of C.F.* are further distinguishable because the record in the instant case shows that Daniel, while not free of trouble, has made significant progress in his behavior and social development. Moreover, there is no evidence that Daniel has ever threatened Megan or that he has violent tendencies. In contrast, in *In Interest of C.F.*, the juvenile C.F. violently threatened the very individual whom he sought to visit, which incident caused his adoptive parents to abandon him to the state.

In reviewing the Nebraska Juvenile Code, we note that in addition to the statutory jurisdictional authority over the parents granted pursuant to § 43-247(5), the juvenile code gives the juvenile court broad authority to initiate care, placement, and rehabilitation plans which are in the best interests of the subject juveniles. Neb. Rev. Stat. § 43-289 (Reissue 1993) provides that "[w]henever any juvenile has been committed to the Department of Social Services, the department shall follow the court's orders, if any, concerning the juvenile's specific needs for treatment or special care for his or her physical well-being and healthy personality." See, also, Neb. Rev. Stat. § 43-285(2) (Reissue 1993); *In re Interest of J. T.B. and H.J. T.*, 245 Neb. 624, 514 N.W.2d 635 (1994); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). Juvenile court orders commonly involve directions to the parents in the nature of seeking family counseling, attending parenting classes, and maintaining adequate visitation with the children. Orders such as the foregoing illustrate the juvenile courts' attempts to reunify subject families and to emphasize family units. See, generally, § 43-246(4). There is no dispute that the family in this case is legally intact and that the parents are the natural parents of both the siblings, Daniel and Megan, and the court had statutory jurisdiction over Daniel and the parents. We do not believe it was plain error for the court to direct the parents to produce Megan for sibling visitation with her legal and biological brother, Daniel.

*Best Interests.*

In their brief, the parents request that in the event we find that the juvenile court had the authority to order the sibling visitation involved in this case, we remand the cause for an evidentiary hearing as to whether the visitation is in Daniel's best interests. We interpret this argument to be in the nature of a due process claim and find the claim to be without merit.

Daniel's guardian ad litem moved for sibling visitation on December 16, 1993. The court postponed ruling on the motion to permit the parents to consult with their counsel and to permit them an opportunity to respond. That opportunity presented itself on February 3, 1994.

On February 3, after notice to all parties, Judge Gendler initially ruled on the issue of supervised monthly sibling visitation between Daniel and Megan. At this hearing, a report from Dwyer and a report from DSS were received in evidence. The parents argued against the sibling visitation, and notwithstanding the opportunity afforded by having approximately 6 weeks to prepare, the parents did not offer evidence contradicting the contents of the State's evidence. On February 3, the trial judge ordered monthly sibling visitation between Megan and Daniel.

The parents did not comply with the sibling visitation order. When the case was further reviewed on June 9, a hearing was held regarding visitation. The parents appeared with new counsel at the June 9 hearing. On June 9, the parents did not offer evidence. The transcription of the proceedings of the June 9 hearing shows that the father answered questions from Judge Gendler and that the parents' counsel presented oral argument. The oral statements of the father and the parents' counsel, in essence, reflect that the parents felt that sibling visitation between Megan and Daniel would create turmoil in their home because of Daniel's manipulative and uncontrollable behavior and would contribute to the family "feud."

At the June 9 hearing, Judge Gendler admitted the most recent DSS case report into evidence and took judicial notice of the exhibits received at the February 3 hearing and his docket entry regarding the February 3 visitation hearing. The judge then continued his order that the parents make Megan available

for supervised sibling visitation with her older brother for 1 hour per month.

The Nebraska Supreme Court has held that hearings regarding rehabilitative plans in juvenile cases are dispositional hearings, to which the Nebraska rules of evidence, Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1993 & Cum. Supp. 1994), do not apply, and due process safeguards at a disposition or detention hearing are less than those required at a hearing regarding the termination of parental rights. *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). The cases do not require an evidentiary-type hearing in connection with periodic disposition hearings for cases where the juvenile has been adjudicated a child under § 43-247(3)(b). See *In re Interest of J.A.*, 244 Neb. 919, 510 N.W.2d 68 (1994). See, also, Neb. Rev. Stat. § 43-286 (Reissue 1993 & Supp. 1994) (setting forth dispositional procedures for § 43-247(3)(b) children and including specific provisions for production of evidence at dispositional hearings only in context of hearings relating to revocation of probation under § 43-286(4)(f)). The record reflects that, under the foregoing standards, the parents received the process they were due at the February 3 and June 9 hearings.

The parents additionally argue that the evidence in this case does not establish that sibling visitation between Megan and Daniel is in Daniel's best interests. We disagree.

As mentioned above, the provisions of the juvenile code generally seek to protect the best interests of the subject children. Section 43-285(2) of the juvenile code authorizes the juvenile court to order DSS to prepare and file a proposed plan for the care, placement, and services which are to be provided to the subject juvenile and his or her family. Under Nebraska case law, the juvenile court may exercise broad discretion and may liberally construe the juvenile code in order to serve the best interests of the children who fall within it. *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987), *overruled on other grounds, State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

In most cases, the juvenile court will initially attempt

to serve the best interests of the subject child by preserving the relationship between the child and the child's family. See, e.g., *In re Interest of J.S., A.C., and C.S., supra.* The Nebraska Supreme Court has stated:

> [O]nce there has been the adjudication that a child is a juvenile within the meaning of the act, the foremost purpose or objective of the Nebraska Juvenile Code is promotion and protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parent(s) where continuation of such parental relationship is proper under the law.

*Id.* at 263, 417 N.W.2d at 156. Additionally, the juvenile code specifically states in § 43-246(4) that its provisions will be construed in a manner "to assure every reasonable effort possible to reunite the juvenile and his or her family." We interpret "family" as used in § 43-246(4) as including the juvenile's sister, Megan.

In the instant case, it became evident that it was not beneficial for Daniel to live at home with his parents during the course of these proceedings. Although it was not possible for Daniel to live at home, Daniel's counselors consistently and continually asserted that Daniel needed to have a relationship with his family. Daniel's counselors urged that the parents make some effort in this regard. Daniel specifically stated that he liked his younger sister and expressed an interest in seeing her. The reports of Dwyer generally to the effect that family contact would be beneficial to Daniel were received by the court at the periodic hearings held in this case. The record reflects that, nevertheless, the parents wanted to sever their relationship with Daniel and did not want Megan to have a relationship with Daniel.

Based on an adequate evidentiary record, the juvenile court found that it was in Daniel's best interests to maintain regular contact with his family. Consequently, the juvenile court ordered 1 hour of supervised monthly sibling visitation between Daniel and his baby sister. In this regard, the juvenile court apparently struck a compromise by ordering contact between the two siblings rather than between Daniel and the parents, who had affirmatively stated that they did not want to be

involved in Daniel's rehabilitation or reunification.

The record indicates that sibling visitation between Megan and Daniel would benefit Daniel. Although the parents do not agree with the visitation order, the order obligating them to make Megan available for visitation with their son for 1 hour per month does not place an onerous burden upon them. It has been stated: "In a question about visitation, as in the case of child custody, a parent's rights are not absolute but must yield to the best interests of the child." *Nielsen v. Nielsen*, 217 Neb. 34, 35, 348 N.W.2d 416, 417 (1984). The benefit to Daniel of sibling association outweighs any burden or inconvenience upon the parents, and there is no evidence in this record that the supervised sibling visitation would have a negative impact on Megan. It was not plain error for the court to conclude that sibling visitation is in Daniel's best interests.

## CONCLUSION

We conclude that the juvenile court did not commit plain error in granting sibling visitation between Daniel and Megan.

AFFIRMED.

IRWIN, Judge, dissenting.

"[T]he relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). "[A] parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). A juvenile court order providing for visitation between a 16-year-old boy and his 2-year-old sister, whom he has not seen since she was 5 months old, surely affects a substantial right. The substantial right affected is that of a parent to decide how to raise a child who has not been brought within the jurisdiction of the judicial system.

Neither the statutes of this state nor developed jurisprudence provides a basis for a juvenile court to order visitation between a minor sibling who is within the jurisdiction of the court and a minor sibling who is not within the jurisdiction of the court. Put

another way, the juvenile court has no jurisdiction to compel a parent of a child within the jurisdiction of the juvenile court, and in the custody of the Department of Social Services, to produce the child's nonadjudicated sibling for visitation. " 'The right to raise one's children has long been recognized as one of our basic civil rights. . . . [G]overnmental intrusion into the family is warranted only in exceptional circumstances. The statutory bas[e]s for court interference with the parents' right to custody are limited and specific, reflecting that philosophy. . . .' " *In Interest of C.F.*, 436 Pa. Super. 83, 91, 647 A.2d 253, 256-57 (1994) (quoting *Weber v. Weber*, 362 Pa. Super. 262, 524 A.2d 498 (1987), *appeal dismissed* 517 Pa. 458, 538 A.2d 494 (1988)).

The case *In Interest of C.F., supra*, which is cited by the majority, is "on all fours" with the instant case. In that case, the court held that since no statutory basis existed which would allow court interference with the parents' right to undisturbed custody of a nonadjudicated daughter, the parents could not be required to produce their daughter for visitation with the child's sibling. The court in *In Interest of C.F.* also discussed whether visitation was in the best interests of the child. This latter issue should not be reached or become the focus of discussion in our case, however, since there exists no authority to order the visitation in the first place.

Three Nebraska statutes and a case from the Superior Court of New Jersey, Chancery Division, are cited as the legal basis for the juvenile court's action in the case before us. Those are Neb. Rev. Stat. §§ 43-246(4), 43-285(2), and 43-289 (Reissue 1993) and *L. v. G.*, 203 N.J. Super. 385, 497 A.2d 215 (1985).

Section 43-246 states as follows:

**Code, how construed.** Acknowledging the responsibility of the juvenile court to act to preserve the public peace and security, the Nebraska Juvenile Code shall be construed to effectuate the following:

. . . .

(4) To achieve the foregoing purposes in the juvenile's own home whenever possible, separating the juvenile from his or her parent only when necessary for his or her welfare or in the interest of public safety and, when

temporary separation is necessary, to consider the developmental needs of the individual juvenile in all placements and to assure every reasonable effort possible to reunite the juvenile and his or her family.

Section 43-285 states:

**Care of juvenile; authority of guardian; placement plan and report; when; standing; State Foster Care Review Board; participation authorized; immunity. . . .**

(2) Following an adjudication hearing at which a juvenile is adjudged to be under subdivision (3) of section 43-247, the court may order the department to prepare and file with the court a proposed plan for the care, placement, and services which are to be provided to such juvenile and his or her family.

Section 43-289 states in relevant part:

**Juvenile committed; release from confinement upon reaching age of majority; hospital treatment; custody in state institutions; discharge. . . .** Whenever any juvenile has been committed to the Department of Social Services, the department shall follow the court's orders, if any, concerning the juvenile's specific needs for treatment or special care for his or her physical well-being and healthy personality.

None of the statutes set out above provide that a juvenile court may order visitation, against the parents' wishes, between their minor child who is within the jurisdiction of the court and their other child, who is not within the jurisdiction of the court. If in fact these statutes were to be interpreted to allow such, there would be no limit to what a juvenile court might do in the name of what is in the best interests of the adjudicated child. Besides visitation, could the juvenile court order the parents to place the *nonadjudicated* child in treatment, counseling, therapy, classes, and whatever else was viewed as being in the *adjudicated* child's best interests? It must also be remembered that if, in fact, these statutes vest the juvenile court with such broad powers, then a parent who refuses to do any of the above is subject to the court's contempt power, as in fact the parents in this case were reminded:

THE COURT: That's fine. Mr. W[.], we shouldn't even

be here fighting about this.

KEN W[.]: That's true, it should be somebody —

THE COURT: No, let me finish. You've talked.

You ought to be putting forth an effort to get to know your son, and I submit to you you've put forth no effort. You better change.

Despite what your attorney says, I do have contempt powers, and I promise you if evidence is appropriately presented to me, I will use it. Also understand under the law I can assess costs against you, and I can order you to pay the costs of the representation of your son, which is currently born[e] by Sarpy County through a contract with Mr. O'Neal. It's time you put forth some effort. This boy deserves it.

It is also noteworthy that § 43-246(2) states that when construing the juvenile code, those doing the construing should give "due regard to parental rights and capacities." Also, § 43-246(5) reminds us that the statutes in the juvenile code should be construed "[t]o provide a judicial procedure through which these purposes and goals are accomplished and enforced in which the parties are assured a fair hearing and their *constitutional and other legal rights are recognized and enforced.*" (Emphasis supplied.)

While I am compelled to write this dissent, it should not be interpreted as lowering the value of sibling relationships. Such relationships should be closely guarded and nurtured, since it is those relationships that will provide a haven in which a child may find refuge during the often turbulent journey of life. Moral or personal value of such does not, however, serve as a basis to ignore Ken and Diane W.'s constitutional rights as parents of Megan W.

The relevant law in this case centers on the constitutional rights of the parents regarding their nonadjudicated child, and absent authority of the juvenile court to interfere with such, the result of this case necessitates reversal.